Carol ANSTETT, Kimberly K. Armstrong, William A. Bauer, et al., Plaintiffs–Appellants,

v.

EAGLE–PICHER INDUSTRIES, INC., Defendant–Appellee.

No. 98–3983.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1999.

Decided Feb. 8, 2000.

Rehearing En Banc Denied March 13, 2000.

Rehearing Denied March 24, 2000.

Jack R. Rochyby (argued), Douglas E. Johnston, Tourkow, Crell, Rosenblatt & Johnston, Fort Wayne, IN, for Plaintiffs-Appellants.

Craig Roy Patterson (argued), Richard H. Blaich, Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, IN, for Defendant-Appellee.

Before RIPPLE, ROVNER and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Eagle–Picher sold its Plastics Division to Cambridge Industries, Inc., which immediately re-employed nearly all of the Plastics Division personnel. Eagle–Picher's Divisional Separation Policy provided severance benefits to its employees under certain circumstances, and the Plastics Division employees believed that the sale triggered application of the policy to them. Eagle–Picher declined to grant the benefits and the employees sued. The district court granted summary judgment in favor of Eagle–Picher. We reverse and remand.

## I.

The plaintiffs were all salaried, at-will employees of Eagle–Picher's Plastics Division. Eagle–Picher entered into an asset purchase agreement with Cambridge on July 9, 1997, and on July 10, 1997, all of the plaintiffs began working for Cambridge without any interruption in employment. One of the benefits offered by Eagle–Picher was a severance policy that provided in relevant part:

Salaried employees terminated other than for cause or voluntary separation, due to the exigencies of the business situation, will be entitled to the following benefits:

- One week's pay, for each year of service to the Plastics Division (final year to be prorated), with a minimum of two months pay (eight weeks) granted to the employee.
- Payment for both unused and accrued vacation.
- Group Medical and Life Insurance coverage of one week's coverage for each year of service, or until covered by another employer's program (minimum of eight weeks).

R. 41, Ex. C, p. 20. The Plastics Division employee handbook also contained a statement regarding the purpose of the plan benefits:

It has always been the policy of Eagle–Picher Plastics Division to improve working conditions and promote the welfare of all employees. In line with this policy, the Company has established and maintains a number of benefit plans to meet the needs of its employees. The primary purpose of these plans is to afford a measure of security for all of us. Some allow us to lead fuller lives, through time off without loss of pay. Others provide for a reasonable amount of protection against unforeseen circumstances.

R. 41, Ex. C, p. 8.[1] Cambridge had no such separation policy, but did provide other comparable benefits to the Plastics Division employees affected by the sale.

After the sale, Eagle–Picher refused to pay out separation benefits, maintaining that the employees had not been terminated as required by the plan. The affected employees sued Eagle–Picher under ERISA, 29 U.S.C. § 1001 *et seq.*, seeking approximately $1 million in separation benefits. Eagle–Picher contended that the policy was intended only to cover employees who suffered a loss of income, and was never intended to cover a corporate asset sale in which the employees were immediately re-hired by the purchaser. The district court agreed. Finding that the separation policy was unambiguous as a matter of law, the district court held that the policy was intended only to provide a degree of security to employees who became unemployed. The district court rejected the employees' argument that the policy

---

1. The plaintiffs dispute whether the Salaried Employee Separation Policy is actually part of the Eagle–Picher Plastics Division employee handbook, or whether it is a separate, stand-alone document. The import of their argument is that if it is a stand-alone policy, the statement of purpose might not apply to this policy. We conclude that even if the Separation Policy is part of the employee handbook and the statement of purpose does apply to that policy, the plaintiffs are still entitled to separation benefits for the reasons we state below.

language referred simply to termination as the triggering event, rather than unemployment. The court similarly rejected the employees' claim that the policy was intended to reward salaried employees rather than protect them from an unexpected period of unemployment. The court found that a more "sensible construction of the language of the policy leads to the conclusion that employees who continue employment with an asset purchaser, and suffer no loss of employment, [are] not entitled to receive separation benefits." *Anstett v. Eagle–Picher Industries, Inc.*, No. 97cv458, slip op. at 8–9 (N.D.Ind. Oct. 16, 1998).

The court agreed with Eagle–Picher's characterization of the policy as intending to assist employees during a period of unemployment. As evidence of this intent, the court noted that the policy provided health and life insurance benefits, but only until the employee was re-employed. Further evidence of this intent was the provision of greater benefits to those employees terminated due to the exigencies of the business situation or for cause than to those employees separated from employment voluntarily. In the former situations, the court agreed, the employee was likely to experience a period of unemployment, while in the latter situation, employees were likely to have new jobs lined up, or were simply retiring. Accordingly, the court found that the policy unambiguously applied only when the employees in question were actually unemployed, and not when their employment was transferred to another company as the result of an asset sale. The employees appeal from the district court's grant of summary judgment in favor of Eagle–Picher.

## II.

■ We review the district court's grant of summary judgment *de novo*. *Green v. Shalala*, 51 F.3d 96,99 (7th Cir.1995); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir.1993). The parties agree that the plan in dispute is an employee welfare benefit plan governed by ERISA. *See* 29 U.S.C. § 1001, *et seq*. We review the denial of benefits *de novo* unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 112, 109 S.Ct. 948, 103 L.Ed.2d 80(1989); *Hickey*, 995 F.2d at 1388–89. Eagle–Picher's plan gave no discretionary authority to the plan administrator, and we thus review the company's interpretation of the plan *de novo*.

■ The claim for separation benefits is really a claim to enforce a contract. *See Hickey*, 995 F.2d at 1389. When there are no genuine issues of material fact, contract interpretation is particularly well-suited for summary judgment. *Id.* We first must decide whether the contract is ambiguous as a matter of law. If so, we may consider undisputed extrinsic evidence to resolve the ambiguity. *Id.* An ambiguous term is one which is subject to reasonable alternative interpretations. The district court found that the contract was unambiguous as a matter of law, and we agree. We do not agree, however, with the court's reading of the relevant terms.

■ We begin by looking at the relevant language in the plan: "Salaried employees terminated other than for cause or voluntary separation, due to the exigencies of the business situation, will be entitled to [separation] benefits." R. 41, Ex. C, p. 20. Eagle–Picher did not consider the employees terminated because they were immediately re-employed by Cambridge. Eagle–Picher asks us to read into the policy a requirement that the affected employees must suffer a period of unemployment in order to recover separation benefits. In support of this interpretation, Eagle–Picher points to two other policy provisions. First, Eagle–Picher cites the purpose statement in the employee handbook, which provides that the "primary purpose of these plans is to afford a measure of

security for all of us. Some allow us to lead fuller lives, through time off without loss of pay. Others provide for a reasonable amount of protection against unforeseen circumstances." R. 41, Ex. C, p. 8. Implicit in this statement, according to Eagle–Picher, is an intent to protect employees who suffer a period of unemployment. In this view, guarding against the insecurity caused by and the unforeseen circumstances of unemployment is the purpose of the policy. Second, Eagle–Picher points to policy provisions granting separation benefits to employees terminated for cause, but granting no separation benefits to employees who leave the company voluntarily. At oral argument, Eagle–Picher claimed that this policy "sets up the expectation that you must lose your job to get benefits. And that's why these appellants are not entitled to any." Eagle–Picher posits that separation benefits could not have been intended as a reward to employees if those terminated for cause received the benefits, and yet employees who served the company faithfully until retirement were entitled to nothing.

In making these arguments, Eagle–Picher tacitly admits that nothing in the express language of the plan requires anything other than termination in order to trigger eligibility for separation benefits. Eagle–Picher disputes whether the employees were terminated because they were immediately re-employed and suffered no real interruption in employment. Although the plaintiffs were re-employed after the sale, they were employed by Cambridge and had, in fact been terminated from Eagle–Picher's employ. Eagle–Picher treated the plaintiffs as terminated for every purpose other than the determination of eligibility for separation benefits. For example, Eagle–Picher sent the employees the required COBRA notification, explaining how to continue their health insurance coverage after the qualifying event of "termination of service." R.41, Ex. D. In the case of persons eligible for certain pension benefits, Eagle–Picher sent notices to those employees describing

the deferred vested benefits to which the employees were entitled as a result of their termination from service on the date of the sale of the division. R.41, Exs. F and Q. In internal and external correspondence, Eagle–Picher referred to the employees as terminated or "termed" as of the date of the sale. R. 41, Exs. H and K. Only in determining eligibility for separation benefits was Eagle–Picher unwilling to consider the employees terminated. On summary judgment, when we are construing all inferences in favor of the party opposing the motion, we must conclude that the plaintiffs were terminated from Eagle–Picher on the date of the sale. Indeed, in light of the evidence we cite above, the inference that the employees were terminated is overwhelming, and Eagle–Picher cites no evidence to refute this conclusion. As terminated employees, the plaintiffs were entitled to separation benefits.

Nor are we persuaded that the policy statement changes that result. The policy statement makes vague reference to employee welfare, and nothing in the statement limits separation benefits to employees who actually suffer a period of unemployment following termination. A "measure of security" and "unforeseen circumstances" can just as easily apply to a change in ownership of the company as to any other kind of termination. After all, a corporate sale or takeover is a time of great uncertainty for the employees, who may then be in a precarious position with their new employer. The grant of separation benefits to employees undergoing a change in ownership can be seen as an incentive to stay on in uncertain times, in order to help the seller maintain the value of the business as a going concern. There is nothing in the plan itself to lead us to any other conclusion, and on summary judgment, we will not construe the purpose statement in Eagle–Picher's favor when there is a reasonable inference to draw in favor of the employees.

Our conclusion is bolstered by other language in the plan, and in a parallel plan document that defines separation benefits for key employees. In the plan itself, Eagle–Picher included language indicating that it knew how to limit a separation benefit to employees who suffered a period of unemployment. In defining the health benefits available to terminated employees, Eagle–Picher specified that medical and life insurance coverage would be provided at a rate of one week's coverage for each year of service, "or until covered by another employer's program." R. 41, Ex. C, p. 20. Eagle–Picher could have limited the salary benefit in the same manner, but did not. Indeed, the company conceded that it would have paid the separation benefit if the terminated employees had obtained jobs on their own and suffered no period of unemployment as a result of their own efforts. The difference in this case, according to the company, is that they knew ahead of time that the plaintiffs would be re-employed by the purchaser at the time of the sale. But the plan draws no distinction between employees forced to go out and find other employment and employees who are re-hired by a purchaser, and we decline to write one into the policy.

Eagle–Picher also indicated in a parallel policy for key employees that it knew how to limit this benefit in the manner it now urges us to do. The key employee severance policy provides:

> If you are terminated by the Company other than for cause, you will receive benefits under the Plan. However, if the operation you work for is sold and you continue to work for the buyer, you will not be entitled to benefits under the Plan.

R. 41, Ex. M, p. 2. The inclusion of this provision in the key employees' policy allows us to draw the following inferences in favor of the plaintiffs. First, Eagle–Picher was aware that a sale of a division could trigger severance benefits unless other language in the policy limited eligibility. Second, Eagle–Picher knew how to draft that limiting language, and did so for its key employees. The absence of similar limiting language in the Plastics Division Employee Handbook can thus be construed as an intent on Eagle–Picher's part not to limit severance benefits for those non-key employees terminated by a sale and re-hired by a buyer.

Our conclusion is also consistent with the many cases addressing similar factual scenarios, in this and other circuits. *See e.g. Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420–21 (7th Cir.1998), *cert. denied,* — U.S. ——, 119 S.Ct. 1496, 143 L.Ed.2d 651 (1999) (employer held to unambiguous language of severance plan granting severance benefits if executive offices moved even though plaintiff's personal office location did not change); *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 31 (1st Cir.1991) (there is no hard and fast rule that an individual must suffer a period of unemployment to collect severance benefits under ERISA; rather the courts look to the specific language of the plan at issue and the particular facts at hand); *Ulmer v. Harsco, Corp.*, 884 F.2d 98, 102–03 (3rd Cir.1989) (under language of severance plan, fact that workplace remained the same was irrelevant in light of change in employer; employees still entitled to severance pay after sale of company followed by re-employment at same location); *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1354–55 (9th Cir.1984), *cert. denied,* 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) (where plan provides severance pay to employees whose jobs were "eliminated," the subsequent reinstatement of those positions by successor corporation is irrelevant to the employees' entitlement to the severance benefits); *Bedinghaus v. Modern Graphic Arts,* 15 F.3d 1027, 1029–30 (11th Cir.1994), *cert. denied,* 513 U.S. 963, 115 S.Ct. 426, 130 L.Ed.2d 339 (1994) (employees entitled to severance pay under language of plan even though they suffered no period of unemployment and were immediately re-hired by purchaser of former employer); *Harris*

*v. Pullman Standard, Inc.,* 809 F.2d 1495, 1498–99 (11th Cir.1987) (employees eligible for severance pay even though they experienced no period of unemployment because there was no such requirement in ERISA plan). Each of these cases looks to the language of the plan, and holds the employer to that language.

Similarly, courts that have ruled that employees are not entitled to severance benefits after a sale also hold fast to the language of the plan at issue. *See Allen v. Adage, Inc.,* 967 F.2d 695, 697–701 (1st Cir.1992) (severance benefit triggered by "reduction in force" not triggered by sale of division accompanied by re-employment by purchaser in context of plan language as a whole); *Harper v. R.H. Macy & Co. Inc.,* 920 F.2d 544, 545 (8th Cir.1990) (examining language of plan document and reading each provision consistently with the others, sale of stores and rehiring of employees did not constitute "permanent termination" as contemplated by plan and no severance benefits were therefore due); *Rowe v. Allied Chemical Hourly Employees' Pension Plan,* 915 F.2d 266, 269 (6th Cir.1990) (underplan language, only a layoff, and not any other type of separation, triggered benefits, and thus sale of plant did not trigger benefits); *Sly v. P.R. Mallory & Co., Inc.,* 712 F.2d 1209, 1212(7th Cir.1983) (ERISA plan must be read as a whole). *Sly* is distinguishable from the instant case because the court was reviewing the plan administrator's denial of benefits under the arbitrary and capricious standard, and was simply upholding the administrator's reading as reasonable. Our decision today is entirely consistent with this line of cases because we are reviewing the plan *de novo,* and because we base our decision on the language of this particular plan taken as a whole.

The district court commented that to award separation benefits to employees who were immediately re-employed would constitute a windfall to these employees. The defendant urges us to reach the same conclusion. But Eagle–Picher knew it had this obligation to its employees at the time of the sale, and presumably included this payout in determining the price to set for the division. Having recouped the cost through the sale, it is Eagle–Picher that would reap the windfall if we failed to hold them to the bargain they struck with their employees. The employees, on the other hand, lost their severance benefits when they began working for Cambridge, which did not offer a comparable benefit. *See Bedinghaus,* 15 F.3d at 1030. This loss turned out to be substantive rather than speculative when Cambridge decided to close a plant some six months after the sale, causing some of the plaintiffs to lose their jobs entirely. This is precisely the "unforeseen circumstances" that called for a "measure of security" in the first place, leading Eagle–Picher to offer the separation benefits to its workers. A ruling favoring the plaintiffs is not a windfall when it simply holds the employer to its bargain. A strict reading of the plan protects the plaintiffs from an uncertain and possibly precarious employment future with a new company, consistent with the plan's statement of purpose.

We therefore hold that the plan at issue is clear and unambiguous. The effect of the plan is to grant separation benefits to the employees when they are terminated from their employment. Termination includes a sale of the Plastics Division to another company, which then re-employs the workers. Entitlement to separation benefits is not predicated on a period of unemployment, but is triggered solely by termination. There is no dispute that these employees were terminated from Eagle–Picher and subsequently re-hired by Cambridge. The plaintiffs are therefore entitled to their separation benefits, and we reverse and remand so that the district court may resolve any remaining factual issues, such as the amount of the damages.

REVERSED AND REMANDED.