**OMNISOURCE CORPORATION,**
Plaintiff,

v.

**NCM AMERICAS, INC., d/b/a Maryland Netherlands Credit Insurance Company, Defendant.**

No. 1:02–CV–036.

United States District Court,
N.D. Indiana,
Fort Wayne, Division.

March 19, 2004.

Cathleen M. Shrader, John F. Lyons, Thomas Andrew Herr, Barrett and McNagny, Fort Wayne, IN, for Plaintiff.

Diana Carol Bauer, Richard P. Samek, Miller Carson Boxberger & Murphy LLP—FW/IN, Fort Wayne, IN, for Defendant.

C. Erik Chickedantz, Hawk, Haynie, Kammeyer & Chickedantz LLP, Fort Wayne, IN, Pro Se.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION[1]

■ In this factually rich but ultimately straightforward case, Plaintiff OmniSource Corporation ("OmniSource") claims entitlement to $1,600,000 on a credit insurance policy issued by Defendant NCM Americas, Inc. ("NCM"), because one of OmniSource's customers, LTV Steel Company, Inc. ("LTV"), declared bankruptcy, leaving Omnisource with some unpaid accounts receivable.[2] For its part, NCM says there is no coverage because: (1) OmniSource made material misrepresentations about its relationship with LTV in its application for insurance; and (2) a specially added provision, the "Back Sales Coverage Endorsement," prohibits recovery.

This Order addresses and GRANTS OmniSource's motion for summary judgment, DENIES NCM's motion for summary judgment, and DENIES OmniSource's motion to strike some testimony as moot.[3]

## II. FACTS

OmniSource sells processed scrap metal, and for many years LTV was a big customer, buying for example, almost $24,000,000 worth of scrap metal in just the last six months of 2000. (Compl. ¶ 8; Answer ¶ 8; Dep. of Robert Reeves, Ex. A, ¶ 18.)

Like approximately 80% of OmniSource's customers, LTV was "self-invoicing," (Dep. of Julie Schultz, Part I, at 71–72), meaning that upon receipt and unloading of each shipment, LTV faxed OmniSource an acknowledgment reporting the weight received (id.; Reeves Dep. at 80–81). The fax thus became the invoice and triggered LTV's payment terms. (Reeves Dep. at 46.) While OmniSource generated its own invoice at the time of shipment, those invoices were only for internal bookkeeping and tracking purposes and were never sent to LTV. (Schultz Dep., Part I at 59–60, 71–73; Dep. of Donna Messick at 63.)

OmniSource and LTV had a longstanding, unwritten agreement regarding payment terms.[4] (Schultz Dep., Part II at 48–50.) LTV processed payments twice a month, on the 7th and the 22nd. (Id.) Goods unloaded between the 1st and 16th of the month were paid for on the 22nd of the following month. (Id.) Goods unloaded

---

1. The Court has jurisdiction based on diversity. See 28 U.S.C. § 1332. OmniSource is a citizen of Indiana (as Indiana is its state of incorporation and its principal place of business), NCM is a citizen of Maryland (as Maryland is its state of incorporation and its principal place of business), and the amount in controversy exceeds $75,000. (Compl. ¶¶ 1, 2, 7; Answer ¶¶ 1, 2, 7.)

2. To oversimplify, credit insurance covers an insured's losses when its credit customers become insolvent. (Compl. ¶ 10; Answer ¶ 10.)

3. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

4. Although OmniSource's internal invoices describe payment terms of "net 30 days" (Messick Dep. at 107), those terms were not followed.

between the 16th and the end of the month were paid for on the 7th of the month after next.[5] (*Id.*) Under this system, payment could occur anywhere between thirty-seven and fifty-two days after receipt of the goods. (*Id.*)

In 1999 and 2000, while engaged in merger discussions with another company, OmniSource decided to obtain credit insurance. (Schultz Dep., Part I at 29–30.) On the recommendation of its proposed merger partner, OmniSource worked with Craig Bonnell ("Bonnell"), an independent credit insurance broker who regularly works with NCM, the second largest credit insurer in the world. (Dep. of Craig Bonnell at 9, 12–13; Dep. of Mark Felmar at 12.) Bonnell provided quotes and application forms to Julie Schultz ("Schultz"), OmniSource's Credit Manager, and assisted OmniSource in preparing two essentially identical applications for NCM insurance, submitted on August 22, and October 12, 2000. (Schultz Dep., Part I at 3, 37–38, 66; *see* Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Exs. A, B.)

NCM's application asked for the terms of sale between OmniSource and its customers, to which OmniSource responded, "[n]ormal terms of sale" are "net 30, 45, 60–various" with the "[l]ongest terms of sale (including dating)" being "net 90 from receipt of material." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. A ¶ 2.)

The application also requested information about OmniSource's past due accounts. (*Id.* ¶ 7.) When prompted to "[l]ist ALL accounts proposed for insurance that are more than 60–days past due from ORIGINAL DUE DATE," OmniSource listed only two: "R. Lavin" and "Decatur Casting Division." (*Id.*) The next question asked OmniSource to "[l]ist ALL accounts

currently causing you concern, even if not 60 days past due," and OmniSource responded: "see above." (*Id.*)

Cindy Tikiob ("Tikiob"), an NCM underwriter, reviewed OmniSource's application and researched the financial condition of OmniSource's customers, including LTV. (Dep. of Cindy Tikiob at 8–9, 15–16.) Tikiob and Mark Felmar ("Felmar"), NCM's vice president of claims underwriting and recovery, decided not to issue any coverage for LTV, due to longstanding concerns about its viability. (Felmar Dep. at 60, 64–65.) However, Bonnell, obviously interested in salvaging the account, urged NCM to provide coverage for LTV. (*See, e.g.,* Bonnell Dep. 62–65, 75, 82–83; Tikiob Dep. at 42.) Eventually, after much discussion, and apparently with considerable misgivings, NCM finally agreed to provide $2,000,000 of coverage for LTV, subject to 20% coinsurance. (Dep. of Arjan van de Wall at 23; Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. D at NCM 124.) According to Neil Leary ("Leary"), NCM's president, both Tikiob and Felmar ultimately made the decision to extend coverage to the LTV risk. (Dep. of Neil Leary at 28–29.)

NCM issued a credit insurance policy ("Policy") to OmniSource, effective November 1, 2000, in return for OmniSource's $323,382 premium payment. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. D at NCM 103; Bonnell Dep. at 94, Ex. 53.) The Policy provides coverage to OmniSource against "LOSS due to INSOLVENCY of BUYERS [*i.e.,* LTV and several other listed OmniSource customers]." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. D at NCM 109, 112.) The Policy then goes on to define a "LOSS" as "the unpaid and undisputed INVOICE PRICE, in part or in full, of

---

**5.** For example, goods unloaded on May 1st would be paid for on June 22nd, and goods unloaded on May 20th would be paid for on July 7th.

sales of goods ... by the Insured, delivered to a BUYER, as of the date of INSOLVENCY." (*Id.* at NCM 110.) Of course, the term "INSOLVENCY" includes a filing for bankruptcy. (*Id.* at NCM 109.)

However, beyond these fundamental terms, NCM also thinks two of the Policy's "conditions" play a role here:

C. Limit Obligations of Insured

It is the duty of the Insured to request the Company to establish named limits of coverage for BUYERS under the conditions of the Policy. When requesting named limits of coverage, the Insured shall fully disclose all known facts concerning the BUYER and the risk.

D. Warranties and Representations

The Warranties and Representations made in the Application for this Policy of Credit Insurance are the basis for this Policy and are material to the risk assumed by the Company under this Policy. Any false warranty, concealment, fraud or material misrepresentation made in obtaining this Policy or in any claim for LOSS under this Policy, shall void this Policy from its beginning.

(*Id.* at NCM 105.)

OmniSource also bargained for and purchased additional special coverage under what NCM calls a Back Sales Coverage Endorsement ("BSCE"), insuring any losses on deliveries made to LTV in the sixty days prior to the Policy's effective date. (*Id.* at NCM 114.) However, notwithstanding OmniSource's efforts to expand coverage, NCM now actually relies on some language in the BSCE to defeat coverage altogether:

No coverage is afforded under this POLICY where the BUYER [*e.g.*, LTV] was INSOLVENT at the effective date of this POLICY [*i.e.*, November 1, 2000] or where, at the effective date of this POLICY, the BUYER was past due under the original terms of sale, or the time for

the payment by the BUYER had been extended by the INSURED beyond the original due date.

(*Id.*)

On December 29, 2000, less than two months after NCM's Policy became effective, LTV filed for bankruptcy, owing OmniSource well over $2,000,000. (Compl. ¶ 21; Answer ¶ 21.)

On April 23, 2001, OmniSource filed with the Bankruptcy Court a Proof of Claim for $3,328,893.43 (later amended to $2,843,743), for scrap metal sold to LTV between December 23, 1998, and December 28, 2000. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. E.) Attached to OmniSource's Proof of Claim was an internal aged accounts receivable report concerning LTV. (*See id.*)

About two weeks later, on May 7, 2001, OmniSource made a claim on NCM under the Policy, seeking Policy limits of $1,600,000 ($2,000,000 less the 20% coinsurance). (*See id.*, Ex. F.) OmniSource attached to its Policy Claim the Proof of Claim from LTV's bankruptcy, including the aged accounts receivable report. (*See id.*)

As a result of OmniSource's claim, NCM hired Aaron Songer ("Songer"), a certified public accountant, to audit LTV's account with OmniSource. (*See id.*, Ex. G.) Songer found that on September 30, 2000, just twelve days before OmniSource's final application for credit insurance, Omnisource was carrying $310,974 in "over 120 days receivables" from LTV. (*Id.* at 3.)

On October 31, 2001, NCM issued a denial letter on OmniSource's claim contending that OmniSource's internal invoices were "misleading because the terms of sale on the invoice (net 15 or net 30 days) are not adhered to." (Compl., Ex. D at 1.) NCM further alleged, with little analysis, that OmniSource's aged accounts

receivable report showed $940,055 to be sixty days "past due" on September 30, 2000, a point not disclosed in OmniSource's October 12, 2000, application. (*Id.*) NCM also stated that LTV was past due on the effective date of the Policy, November 1, 2000, thus negating coverage under the BSCE.[6] (*Id.*) Finally, NCM claimed that it did not become aware of OmniSource's 37/52 day payment terms with LTV until after underwriting the Policy, and "[t]his withheld information may have altered our underwriting decision." (*Id.* at 2.) Notwithstanding these contentions, NCM nevertheless offered to make an "out of policy payment" of $847,956, based on what it deemed a "unique situation." (*Id.*) Eschewing NCM's offer, OmniSource filed suit.

Songer now reappears as NCM's expert (Dep. of Aaron Songer at 14), although NCM makes little use of his testimony. Nevertheless, in his report, Songer poses three reasons why NCM's denial of Omni-Source's claim is legitimate. (*See* Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. H.) First, Songer opines that Omni-Source failed to disclose in its application that LTV had $99,727 in balances over sixty days past due. (*Id.*) Second, Songer asserts that OmniSource's bankruptcy claim lists $111,030 in LTV receivables more than ninety days overdue, in stark contrast to its application, where it represented that the "longest terms of sale" were only "net 90 from receipt of material." (*Id.*) Finally, Songer thinks that on November 1, 2000, the effective date of the Policy, $111,030 in LTV invoices were also overdue (according to the 37/52 day payment schedule), thus triggering the BSCE and its provision that there is no coverage

if, on "the effective date of this POLICY, the BUYER was past due under the original terms of sale...." (*Id.*)

NCM also offers some testimony from several employees centered on the proposition that its underwriting decisions might have been different had the company received more information about Omni-Source's dealings with LTV. Taking a rather broad view of the entire thing, NCM's president, Leary, states that "one of the fundamental criteria" for underwriting is "full disclosure of any possible past dues or any additional terms that have not been disclosed in the application." (Leary Dep. at 34.) Even broader, he also says that the decision to provide coverage requires "fully disclosed information about the trading relationship" between the proposed insured and its buyers. (*Id.* at 48.) For example, Leary believes that any difference between OmniSource's actual billing practices and those indicated on their internal invoices should have been disclosed.[7] (*Id.* at 53.)

Felmar, one of the actual underwriting decision makers, believes that OmniSource should have disclosed the alleged overdue accounts, and what he calls its "unique billing situation" with LTV. (Felmar Dep. at 165.) Likewise, Arjan van de Wall ("van de Wall"), NCM's vice president of sales, considers disclosure of 60–day past due accounts "a critical factor" and believes NCM "most likely ... would never have put coverage on the table" had it known of the $940,055 in allegedly past due receivables. (van de Wall Dep. at 24, 50.)

OmniSource also retained an expert, Robert Reeves ("Reeves"), a certified pub-

---

6. NCM's letter does not specify the amount allegedly past due on November 1, 2000, but presumably is referring to the $940,055. (*See* Compl., Ex. D. at 1–2.)

7. However, NCM's corporate governance rules prohibit Leary from making underwriting decisions, so while he "can be a decision influencer," he cannot be an underwriting "decision maker." (Leary Dep. at 11–12.)

lic accountant, to review the denial of coverage. (*See* Pl.'s Mem. in Opp'n to NCM America's Mot. for Summ. J., Ex. F.) In particular, Reeves analyzed in detail the $940,055 of LTV receivables which Leary, Felmar, and van de Wall believe should have been disclosed on OmniSource's application. (*Id.* at 6–7.) Reeves concluded that OmniSource correctly excluded all $940,055 from its application because: (1) ($52,263) of the receivables represent a number of relatively minor "pricing disputes" between OmniSource and LTV;[8] (2) $393,461 on the September 30, 2000 accounts receivable report was paid by LTV before OmniSource's final application on October 12, 2000; (3) $124,746 represented shipments which were not acknowledged by LTV before October 12, 2000, and thus were not yet due; (4) $366,007 were acknowledged by LTV prior to October 12, 2000, but were not yet sixty days past due under the 37/52 payment arrangement; (5) $20,962 are attributable to clerical errors; and (6) $87,812 were for shipments never received by LTV and thus written off by OmniSource. (*Id.* at 6–7.)

If Reeves is correct, these six findings explain the $940,055 "to the penny," and more importantly, show that in reality LTV was not more than sixty days past due on the application date. (Reeves Dep. at 97.) Moreover, Reeves offers the opinion that LTV's 37/52 payment terms "clearly fall within" the parameters of the "net 30, 45, 60–various" and the "net 90 from receipt of material" terms disclosed by OmniSource on its application. (*Id.* at 7.) For these reasons, Reeves concludes that OmniSource provided "true and accurate information" on its application, and

thus has a valid claim against NCM.[9] (*Id.* at 2.)

### III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the [non-moving party]." *In re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,*

---

8. Although sometimes LTV paid a little less than OmniSource's internal invoice price, most of the time it paid slightly more. (Pl.'s Mem. in Opp'n to NCM America's Mot. for Summ. J., Ex. F at 6.) Accordingly, the total

of all those "pricing disputes" is actually a negative $52,263.

9. Reeves did not address the BSCE. (Reeves Dep. at 71.)

802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988); *see also Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249–251, 106 S.Ct. 2505. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.

R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; it must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *First Nat'l Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. 2505.

The existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir.2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir.2001) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998)).

Where there are no genuine issues of material fact, contract interpretation is a matter well-suited for summary judgment. *Anstett v. Eagle–Picher Indus., Inc.*, 203 F.3d 501, 503 (7th Cir.2000). An insurance policy is interpreted as any other contract, and thus construction of an insurance policy is a question of law for which summary judgment is particularly appropriate. *Piers v. Am. United Life Ins. Co.*, 714 N.E.2d 1289, 1290 (Ind.Ct.App.1999).

## IV. DISCUSSION[10]

OmniSource claims entitlement to summary judgment because there is no genuine issue of material fact that it suffered a "LOSS due to INSOLVENCY of [LTV]." More particularly, a "LOSS" is defined by the Policy as "the unpaid and undisputed INVOICE PRICE ... of sales of goods ... by [OmniSource], delivered to [LTV], as of the date of INSOLVENCY." In that regard, OmniSource suffered a loss well over $2,000,000 as a result of LTV's bankruptcy, and therefore, absent a policy defense, is entitled as a matter of law to the Policy limits less the 20% coinsurance.

NCM's motion for summary judgment does in fact advance policy defenses, namely that (1) OmniSource made material misrepresentations on the application that voided coverage both under Indiana law and the express terms of the Policy; and (2) the language of the BSCE bars any claim.

Thus, given this procedural posture, if NCM can establish that OmniSource made material misrepresentations on the application for insurance, or that the BSCE works to bar OmniSource's claim, then it is entitled to summary judgment. However, if NCM cannot establish either of these propositions (or at least raise a reasonable inference in its favor regarding either one), then OmniSource prevails. *Anderson,* 477 U.S. at 251–252, 106 S.Ct. 2505. To these questions the analysis turns.

### A. There Were No Material Misrepresentations

■ Under Indiana law, an enforceable insurance contract requires the standard elements necessary in any other contract. *Northern Assurance Co. of Am. v. Lark,* 845 F.Supp. 1301, 1309 (S.D.Ind. 1993), *aff'd,* 17 F.3d 956 (7th Cir.1994). An insurance contract therefore requires a meeting of the minds between the insurer and the insured on the essential elements of the contract, particularly the nature of the risk insured. *Id.* A material misrepresentation or omission regarding substantial factors affecting the nature of the risk insured upsets any mutuality of understanding between the parties and renders the insurance contract voidable by the insurer. *Id.* For instance, the contract is voidable if representations in an application are (1) false; and (2) material to the risk involved. *Watson v. Golden Rule Ins. Co.,* 564 N.E.2d 302, 304 (Ind.Ct.App. 1990). It is irrelevant whether the false representations were made innocently or with fraudulent intent. *Id.*

■ A representation is material if the fact omitted might reasonably have influenced the insurer in deciding whether to reject or accept the risk or charge a higher premium. *Id.* The burden of proof is on the insurer to show materiality. *See Stout v. Farmers Ins. Exch.,* 881 F.Supp. 401, 405 (S.D.Ind.1994) (holding that insurer has burden of proof when asserting affirmative defenses, such as misrepresentation in claim for losses). Normally, the materiality of a representation is a question of fact for the jury, but it can be decided as a matter of law if the evidence allows no reasonable difference of opinion. *Watson,* 564 N.E.2d at 306.

---

10. Neither party directly addresses the question of which state's law should apply to this case, and the Policy is silent on the issue. However, the parties apparently agree that Indiana law should apply, as they both cite numerous Indiana authorities. Moreover, it appears that Indiana is the forum with the most intimate contacts to the facts. *See Bedle v. Kowars,* 796 N.E.2d 300, 302 (Ind.Ct.App. 2003) ("Indiana's choice of law rule for contract actions calls for applying the law of the forum with the most intimate contacts to the facts"). Thus, the Court will apply Indiana law.

OmniSource also has a contractual duty to make truthful representations on its application because the Policy requires full disclosure of "all known facts concerning the BUYER and the risk" when requesting coverage. Moreover, the Policy provides that "[a]ny false warranty, concealment, fraud or material misrepresentation made in obtaining this Policy or in any claim for LOSS under this Policy, shall void this Policy from its beginning."

■ NCM points to three alleged material misrepresentations or omissions on OmniSource's application: (1) its failure to disclose "LTV's significant past dues well over 60 days"; (2) LTV's "unusual" 37/52 payment terms; and (3) the silence concerning the self-invoicing arrangement.[11] The Court will address each allegation in turn.

### 1. LTV's Alleged "Past Due" Accounts Were Not Past Due

■ On its insurance application, Omni-Source was required to "[l]ist ALL accounts proposed for insurance that are more than 60 days past due from ORIGINAL DUE DATE" and to "[l]ist ALL accounts currently causing you concern, even if not 60 days past due." LTV was not mentioned in response to either question and NCM says this is a material omission given that LTV's account was more than sixty days past due from the original due date, either in the amount of $940,055 or $111,030. NCM's confusion about the amount apparently stems from failing to conduct a careful examination of the record, because the Court's painstaking examination of it clearly reveals that the $111,030 is included in the $940,055 amount.[12] Thus, the question becomes: on

11. As a threshold matter, OmniSource alleges that NCM is estopped from making these arguments because under Indiana law, "[i]f an insurer retains the premiums paid on a policy which it knows to be void *ab initio* ... the insurer will be estopped from denying liability...." *Hitt v. Githens*, 509 N.E.2d 210, 212 (Ind.Ct.App.1987). More particularly, Omni-Source says that NCM has not returned any of the premiums OmniSource paid under the Policy, and thus is estopped from claiming that the Policy is void.

However, NCM provided OmniSource with coverage for numerous buyers other than LTV, and paid on several claims concerning those buyers during the first year of the Policy. (*See* Bonnell Dep. at 90–91, Exs. 49, 56; Aff. of Richard P. Samek, Ex. A.) Obviously, NCM did not know the Policy was void *ab initio* ("[f]rom the beginning," *Black's Law Dictionary* 3 (abridged 7th ed.2000)), as *Hitt* requires, or it would not have paid on these claims.

Moreover, there is an exception to *Hitt's* estoppel doctrine: "if *some* risk, albeit minimal, attaches to the insurer ... the insurer is not estopped from denying liability." 509 N.E.2d at 213. NCM's payment of claims proves that *"some* risk" still attached to NCM while it was retaining OmniSource's premi-

ums. Thus, NCM is not estopped from arguing that OmniSource's alleged misrepresentations voided the Policy.

12. In its original denial letter to OmniSource, NCM alleged that $940,055 was sixty days past due on the application date. (Compl., Ex. D.) Later, Songer claimed in his expert report that the figure was $99,727. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. H.) NCM cites both figures in its Statement of Facts, (*id.* at 11, 13), but also includes a chart which appears to show that $111,030 was ninety days past due (so obviously more than sixty days past due) at the time. (*Id.* at 8–9.) In the Argument section of the brief, NCM makes no attempt to explain or reconcile these three figures, but only refers generically to "LTV's past dues over 60 days." (*E.g., id.* at 20.)

NCM's subsequent briefs are no more illuminating, as they continue to make vague references to "LTV's significant past dues over 60 days" without citation or explanation. (*E.g.,* Def.'s Resp. at 2; Def.'s Reply at 11.) However, at one point, NCM claims that $111,030 worth of receivables "should be considered past due amounts under the 37/52 payment terms as of the [date] of Omni-Source's application for credit insurance,"

October 12, 2000, when OmniSource submitted its final insurance application, was $940,055 (or any portion of it) "more than 60 days past due from ORIGINAL DUE DATE"?

 NCM seems to take it as an article of faith that because OmniSource's September 30, 2000, accounts receivable report shows $940,055 in receivables aged more than sixty days they all must be, *ipso facto*, "past due." This simplistic notion is fatally blind to many practical points, but one in particular is critical; while Omni-Source's report dates its receivables from

the day of *shipment,* LTV's payment obligation does not begin under the self-invoicing procedure until the shipment is acknowledged on the day it is *unloaded.* Moreover, the receivable is not "due" until between thirty-seven and fifty-two days later, and it does not become "sixty days past due" until sixty days after that. Thus, a receivable might not become "sixty days past due" until months after it appears on the report.[13]

In fact, OmniSource contends that a close study reveals none of the $940,055 was more than sixty days past due as of October 12, 2000.[14] Reeves, OmniSource's

---

and then adds a footnote claiming that "[i]f the definition of 'Loss' in the Policy is used, which relates to 'unpaid and undisputed Invoice Price,' then the total unpaid past due amounts would be $940,055." (Def.'s Reply at 13 and n. 3.) Thus, it appears that NCM is also including the receivables which make up the $111,030 figure in the $940,055 amount.

This interpretation is borne out by the Court's own review of the underlying documents. Reeves's expert report attempts to explain each of the receivables in NCM's claimed $940,055 figure. Of the eleven invoices which NCM cites as part of the $111,030 figure (*see* Def.'s Reply at 13), nine of them are included in Reeves's report: Invoice # 19608, 19609, 21469, 12900, 23902, 22151, 24153, 18935, and 13299. (*See* Pl.'s Resp., Ex. F., Exs. VI, VII.) The remaining two, Invoice # 25429 and 25449, are not found in Reeves's report by those numbers; however, two invoices with identical dates and dollar amounts are found under different numbers, Invoice # 23671 and 24158. (*See id.,* Ex. VI at 1, 2.) Thus, it is clear that the receivables that make up the $111,030 figure also constitute part of the $940,055 figure.

Apparently, NCM has abandoned Songer's unsupported assertion that $99,727 was sixty days past due, since it receives no further mention in its briefs.

**13.** In its cross-motion for summary judgment, and citing Songer's testimony, NCM includes a description of this self-invoicing procedure in its factual recitation. Curiously, in its subsequent response to OmniSource's cross-motion, NCM offers a convoluted argument that the self-invoicing procedure was not really the actual agreement between OmniSource and

LTV. For instance, NCM challenges the assertion that LTV's payment obligation began upon acknowledgment of a shipment, claiming that "the concept of 'acknowledgment' [was] artificially contrived by [Reeves] in a desperate attempt to explain" the alleged past due amounts. NCM's only "evidence" to support this charge is that the record lacks written confirmation of the self-invoicing procedure. (Def.'s Resp. at 5–6.) However, this lack of written evidence is inconsequential, particularly given the copious oral testimony confirming the agreed terms between Omni-Source and LTV. In fact, NCM's own expert witness concluded that LTV self-invoiced as described above (Songer Dep. at 38–43, 103–05), and several NCM employees also testified to the legitimacy of the self-invoicing process (Messick Dep. at 63–64, 85–86; Felmar Dep. at 154–55; Tikiob Dep. at 66).

A party is not allowed to create genuine issues of material fact by contradicting its own testimony. *See U.S. v. Torres,* 142 F.3d 962, 968 (7th Cir.1998). Allowing such a tactic would undercut "the very purpose of the summary judgment motion-to weed out unfounded claims, specious denials, and sham defenses." *Id.* (quoting *Essick v. Yellow Freight Sys., Inc.,* 965 F.2d 334, 335 (7th Cir.1992)). Accordingly, NCM's attempt to create a genuine issue by contradicting its own witnesses, and even its previous briefs, is unavailing. *See id.* (holding that party could not create genuine issue "through the vehicle of shifting defense theories").

**14.** NCM has an annoying tendency to claim that OmniSource "concedes" or "does not

expert, performed just such an exacting analysis by breaking down the $940,055 figure into six categories: (1) a compilation of many small pricing disputes between OmniSource and LTV; (2) amounts LTV paid prior to the application date; (3) receivables that LTV had not acknowledged by the application date; (4) receivables that LTV acknowledged before the application date, but which did not become sixty days past due until after that date; (5) clerical and accounting errors by OmniSource; and (6) lost shipments that OmniSource eventually wrote off. NCM challenges only the first category.[15] To resolve the issue, the Court must consider whether there existed "pricing disputes" between LTV and OmniSource, and when, if ever, such amounts could be considered "past due."

Neither the Policy nor the application defines "past due." Nonetheless, "[t]here is no rule in insurance policy construction that each and every term must be defined," and "a term is not ambiguous simply because it is not defined." *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind.Ct.App.1997). Rather, a court must give the term its plain and ordinary meaning. *Id.* For this purpose, "courts may properly consult English language dictionaries." *Ashlin Transp. Serv., Inc. v. Ind. Unemployment Ins. Bd.*, 637 N.E.2d 162, 167 (Ind.Ct.App.1994); *see Smith*, 681 N.E.2d at 223 (using dictionary to define terms in insurance policy). To that end,

Webster's says that "due" means "having reached the date at which payment is required." *Merriam–Webster's Collegiate Dictionary* 357 (10th ed.2001). Obviously, a receivable cannot have "reached the date at which payment is required" if the parties have not yet determined the amount of payment. Consequently, a disputed receivable does not fit within the plain meaning of "past due." Although at some point, of course, a seller may conclude that the buyer is being disputatious just to forestall paying, and out of frustration declare the amount "due" or "past due," there is no evidence that OmniSource thought that was LTV's game, or that it ever unilaterally declared any LTV amount "past due." Consequently, the only reasonable inference to be drawn from these circumstances is that OmniSource just kept these relatively small amounts on its books, deeming them to be neither due, nor "past due," with the expectation of an eventual reconciliation or adjustment.

So, to establish some amount to be more than sixty days "past due," NCM must show that LTV's "pricing dispute" receivables were actually undisputed, or, to prevent summary judgment in favor of OmniSource, at least provide something that gives rise to such an inference. On this point NCM offers two arguments, with a common theme that OmniSource is trying to "have it both ways."

---

dispute" propositions which obviously are disputed. Consider this statement from NCM: "LTV's significant past dues well over 60 days, particularly the more than $100,000 which OmniSource does not dispute, is clearly material information...." (Def.'s Reply at 7 (footnote omitted).) This statement is astounding given that OmniSource spends dozens of pages arguing, convincingly as it turns out, that LTV had *no* "past dues well over 60 days." Here and elsewhere, NCM's briefs seem designed to confuse rather than enlighten the Court.

**15.** Although NCM does not explicitly concede the rest of Reeves's conclusions, it erroneously states in its reply brief that "OmniSource argues that the $940,055.00 of receivables from LTV were *all* disputed amounts" (*see* Def.'s Reply at 12–13 (emphasis added)), and then does not address any of Reeves's explanations other than the alleged pricing disputes in category (1) (except for the allegedly contrived "concept of acknowledgment" dispensed with at note 13 *supra*).

First, NCM complains that OmniSource, by characterizing the receivables as disputed on October 12, 2000, but then including them in its April 23, 2001, Proof of Claim in LTV's bankruptcy, is trying to "change the ballgame." (Def.'s Reply at 15.) In that regard, NCM puts great emphasis on the testimony of Schultz, OmniSource's Credit Manager, who testified that "[w]e would not put anything in [the Proof of Claim] that we felt was not legally sustainable...." (Schultz Dep., Part II at 46.) According to NCM, inclusion of the receivables in the Proof of Claim, combined with OmniSource's belief that everything in that Claim was "legally sustainable," amounts to a concession that the receivables were really undisputed some six months earlier, and therefore "past due," on the application date.

However, NCM's argument ignores some basic principles of bankruptcy law. A proof of claim is a "written statement setting forth a creditor's claim," Bankr.R. 3001, which a creditor must file when the debtor schedules the claim as "disputed, contingent, or unliquidated," *see* 11 U.S.C. § 1111(a). The debtor may then object to the claim and have it adjudicated through the adversary process. Bankr.R. 3007; *see also* Bankr.R. 7001. On the other hand, a creditor is not required to file a proof of claim for debts listed as undisputed. *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir.1993). In fact, filing a proof of claim for an undisputed amount is unnecessary, as a claim is automatic by operation of law. 11 U.S.C. § 1111(a). Thus, if anything, OmniSource's inclusion of the pricing dispute receivables in its Proof of Claim *reinforces* its contention that they were disputed some six months earlier, and hence not "due," let alone "past due," on the application date.

Moreover, Schultz's statement that OmniSource "felt" that the receivables were "legally sustainable" does nothing to prove that they were undisputed, and only shows that OmniSource had awakened to the reality that with LTV no longer free to reconcile or adjust its own accounts, OmniSource would now have to establish entitlement to its receivables in bankruptcy court, and only then would they be due from LTV's bankruptcy estate.

NCM's second argument is that OmniSource's inclusion of the receivables in its claim on the Policy is an admission that they are undisputed, since the Policy only provides coverage for undisputed amounts. This is a re-packaging of NCM's principal theme, that OmniSource first claims the receivables are disputed on the application date (and thus not past due), but then says they are undisputed (and thus recoverable) by submitting a claim on the Policy.

However, NCM's argument rests on the faulty premise that OmniSource's submission of the receivables for reimbursement implies they are undisputed. No more compelling evidence on this score exists than NCM's own Policy, which provides:

> If any indebtedness of a BUYER to the Insured is disputed in whole or in part, the amount disputed shall not be allowed in any settlement under this Policy. When the disputed amount has finally been determined to be an acknowledged indebtedness by the BUYER or the BUYER'S estate, then the indebtedness so far as covered under this Policy shall be settled and the amount due the Insured shall be paid.

(Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. D at NCM 107.) Clearly, NCM's Policy contemplates that insureds will include disputed amounts in their Policy claims with the understanding that once the indebtedness has been "acknowledged by the BUYER or the BUYER'S [bankruptcy] estate," the amount covered under the Policy will be paid. Conse-

quently, OmniSource's inclusion of the pricing dispute receivables in its claim, at NCM's implied invitation, hardly gives rise to an inference that the receivables were in reality undisputed on the application date. Indeed, all that can be said for this act is that it puts NCM on notice that OmniSource has, in its view, a "legally sustainable" claim against LTV's bankruptcy estate, and once it is constructively "acknowledged" by an adjudication in bankruptcy, the resulting sum certain indebtedness is a covered loss under the Policy.

Thus, in the end, NCM does nothing to challenge Reeves's explanations for almost all of the $940,055, and instead chooses to quibble over whether some tiny fraction of LTV's account was truly disputed, virtual pocket change in the overall context of $24,000,000 in semi-annual sales. Like insuring LTV's creditworthiness, this is risky business, and NCM simply cannot pull it off. To put it in legalese, NCM produces no evidence casting doubt on Reeves's explanation for every dollar of LTV's receivables, which means they were not more than sixty days past due to OmniSource on the application date and OmniSource therefore as a matter of law did not misrepresent this fact on the application.

### 2. 37/52 Payment Terms Were Disclosed

■ On its insurance application, OmniSource described its "normal terms of sale" as "net 30, 45, 60–various," and its "longest terms of sale" as "net 90 from receipt of material." NCM alleges that these answers misrepresented OmniSource's 37/52 payment arrangement with LTV, rendering the contract voidable under Indiana law. See Lark, 845 F.Supp. at 1309.

As noted earlier, an insurance contract is voidable when representations in the application are (1) false; and (2) material to the risk involved. Watson, 564 N.E.2d at 304. Here, NCM fails to establish the first of these two elements, because the 37/52 payment terms clearly fall within the descriptions OmniSource gave on the application. Included in the "normal terms of sale" was "various," and LTV's payment terms indeed varied between 37 and 52 days. Moreover, LTV's payments always came due within 52 days after receipt of the material (barring a pricing dispute, lost shipment, or some other irregularity), well within the 90–day limit OmniSource disclosed on the application.

While it could be said that OmniSource's representations about its payment terms were imprecise, no reasonable jury could conclude they were false, or even misleading. Accordingly, as a matter of law, OmniSource did not misrepresent the 37/52 payment terms on its application.

### 3. There Is No Evidence That Self-Invoicing Was Material

■ OmniSource did not disclose on the application its self-invoicing procedure with LTV, a material omission according to NCM. Since the information is clearly not on the application, the only issue, and one on which NCM bears the burden of proof, see Stout, 881 F.Supp. at 405, is whether the omission is material, normally, but not always, a question of fact for the jury. Watson, 564 N.E.2d at 306. A representation is material if the fact omitted might reasonably have influenced the insurer in deciding whether to reject or accept the risk or charge a higher premium. Id. at 304.

As discussed supra, OmniSource did not misrepresent any past due accounts or its 37/52 payment terms, as a matter of law. Thus, since OmniSource's only misrepresentation in this case was its omission of the self-invoicing procedure, NCM must show that knowledge of self-invoicing alone might reasonably have influenced its

decision whether to extend coverage to the LTV risk. *Id.* at 304.

While NCM proffers considerable evidence on the issue of materiality (*see* Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 13–16), almost none of it is applicable to the critical issue presented here. For example, most of the testimony amounts to nothing more than vague platitudes about the importance of full disclosure to the underwriting process (*see, e.g.,* Leary Dep. at 48), and sheds no light on whether NCM's decision might have been different had it known of the self-invoicing procedure. *See Bush v. Washington Nat'l Ins. Co.,* 534 N.E.2d 1139, 1142 (Ind.Ct.App. 1989) ("although experts may give their opinion as to materiality, the final inquiry is what *that company* might reasonably have done" (internal quotation marks omitted)). Moreover, when the testimony does get specific, it almost invariably focuses on the alleged past due amounts rather than self-invoicing.[16] (*E.g.,* Felmar Dep. at 165; van de Wall Dep. at 24, 49–50, 53).

Indeed, only one witness barely touches upon the issue, Leary, and his testimony is hardly supportive of the proposition that knowledge of the self-invoicing procedure alone might have influenced NCM's decision. Leary testified as follows:

Q: Would a difference in billing and payment practices, other than reflected on the invoice to be net 30, be the kind of information that, in your mind, ought to be fully disclosed in the application?

* * *

A: Of course, yes.

Q: Is that a risk-bearing component of the coverage?

A: That's correct, yes.

(Leary Dep. at 53.) It is hard to make much of this testimony, since Leary never mentions self-invoicing specifically, and confines his opinion, such as it is, to generic "billing and payment practices." This is a far cry from stating affirmatively that self-invoicing as practiced by OmniSource might reasonably have influenced NCM's decision to extend coverage.

Moreover, Leary also testified that NCM's corporate governance model does not allow him to be "a decision maker on credit underwriting," and at most he is a "decision influencer." (*Id.* at 11–12.) More particularly, Leary insists that it was Felmar and Tikiob, not him, who ultimately made the decision to cover the LTV risk (*id.* at 28–29), and they are notably silent on the issue. Since Leary did not make the decision to extend coverage on LTV, his opinion on whether knowledge of the self-invoicing procedure might reasonably have influenced NCM's decision, that is, Felmar and Tikiob's decision, is of virtually no value. *See Bush,* 534 N.E.2d at 1142.

In short, while NCM proffers much evidence on the issue of materiality, none of it raises even an inference that knowledge of self-invoicing alone might reasonably have influenced its decision.[17]

---

16. For instance, when Felmar was asked if OmniSource should have disclosed the self-invoicing procedure on its application, he eventually allowed that NCM would have liked to have known about "this whole unique billing situation up front," but only after stressing that "what *really* should have been provided was the past due information." (Felmar Dep. at 165 (emphasis added).) This testimony does not support an inference that knowledge of self-invoicing *alone* might have changed NCM's decision.

17. While OmniSource moves to strike much of NCM's proffered testimony concerning materiality, on the grounds that it is given "by witnesses who have no personal knowledge or expertise ... regarding the underwriting process" (Mem. in Supp. of Mot. to Strike at 1), even if considered, the testimony still fails to create a genuine issue on whether the self-invoicing procedure was material. OmniSource's motion to strike is therefore moot and will be DENIED.

Thus, since this record allows no reasonable difference of opinion, the self-invoicing procedure was not material as a matter of law, meaning that OmniSource's omission of it from the application does not render the Policy voidable.[18]

### B. The Back Sales Coverage Endorsement Does Not Apply

■ Finally, NCM argues that the BSCE denies coverage when "at the effective date of this POLICY, the BUYER was past due under the original terms of sale," and that the endorsement applies here because on the date the policy became effective, November 1, 2000, LTV was past due on its accounts with OmniSource.

■ To avoid coverage, NCM must show that the exclusionary language "clearly and unmistakably bring[s] within its scope the particular act or omission that will ... exclude coverage." *Great Lakes Chem. Corp. v. Int'l Surplus Lines Ins. Co.*, 638 N.E.2d 847, 850 (Ind.Ct.App. 1994), *order of transfer vacated*, 698 N.E.2d 1192 (Ind.1998). Any doubts as to the scope of the exclusion must be construed against the contract drafter. *Meridian Mut. Ins. Co. v. Purkey*, 769 N.E.2d 1179, 1182 (Ind.Ct.App.2002).

While NCM's argument here is similar to its previously rejected contention that OmniSource misrepresented the alleged past due amounts on its application, there are two important distinctions which NCM completely ignores. While the earlier misrepresentation issue concerned accounts that were "more than 60 days past due" as of the application date, October 12, 2000, the BSCE focuses on what was simply "past due" when the Policy became effective, November 1, 2000.

Blind to these important distinctions, NCM apparently contends, and grounds its arguments upon, the notion that the receivables allegedly "more than 60 days past due" on October 12, 2000, are the same receivables supposedly "past due" on November 1, 2000. (*See, e.g.,* Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 23–24.) However, because NCM has lost sight of the critical time frame, it offers no evidence in support of this argument, and therefore of course, no inference arises that LTV was past due on the effective date of the Policy, the only circumstance that triggers the BSCE.[19] Accordingly, the BSCE does not defeat OmniSource's claim.[20]

## V. CONCLUSION

Since no reasonable jury could find for NCM, OmniSource's motion for summary judgment, which is effectively unchallenged, is GRANTED, and NCM's motion

---

18. There is one final reason why OmniSource's omission was not material. As a general matter of insurance law, an applicant cannot be found to have made a material omission unless he is "reasonably chargeable with knowledge that the facts omitted were within the scope of the questions." *Hoosier State Bank of Ind. v. Int'l Surplus Lines Ins. Co.*, 544 F.Supp. 124, 127 (N.D.Ind.1982). In this case, it is not apparent that any question on OmniSource's application was "reasonably designed to elicit" a description of the self-invoicing procedure. *See id.*

19. The Court therefore does not need to reach OmniSource's contention that the BSCE provides illusory coverage. *See Davidson v. Cincinnati Ins. Co.*, 572 N.E.2d 502, 508 (Ind.Ct. App.1991).

20. NCM repeatedly notes that Reeves's expert report does not offer an opinion about whether OmniSource breached the BSCE. This is true, but irrelevant. NCM has the burden of showing that the BSCE's exclusionary language "clearly and unmistakably bring[s] within its scope the particular act or omission that will ... exclude coverage." *Great Lakes Chem. Corp.*, 638 N.E.2d at 850.

for summary judgment is DENIED. OmniSource's motion to strike is DENIED.

While OmniSource is therefore apparently entitled to a principal judgment in the amount of $1,600,000, it also seeks, and may be entitled, to prejudgment interest. For that reason, no final appealable judgment is being entered at this time. *See* Fed.R.Civ.P. 54(b). Therefore, the parties are ORDERED to confer and make a good-faith attempt to stipulate to the amount of prejudgment interest to which OmniSource is entitled, if any. If the parties are able to agree on an amount, they are to file a joint stipulation no later than April 8, 2004, indicating the amount of interest due as of the date of the stipulation together with a *per diem* rate. If the parties cannot agree, then OmniSource is granted until April 15, 2004, to file a motion seeking to establish: (1) its entitlement to prejudgment interest; (2) the interest accrual date; (3) the applicable interest rate; and (4) the amount of calculated interest due as of a date certain with a *per diem* rate thereafter. The motion will be briefed in accordance with Local Rule 7.1.