# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-2997

JON MAGIN,

*Plaintiff-Appellant,*

v.

MONSANTO COMPANY, PHARMACIA
CORPORATION and CP KELCO, INCORPORATED,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1366—**James F. Holderman**, *Judge.*

_____

ARGUED MARCH 30, 2005—DECIDED AUGUST 23, 2005

_____

Before BAUER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Jon Magin filed this action against
Monsanto Company, Pharmacia Corporation[1] and CP Kelco,
U.S., Inc. ("CP Kelco") to recover severance benefits that he

---

[1] In mid-2000, Monsanto Company merged with Pharmacia &
Upjohn Corporation; the combined companies then operated
under the name Pharmacia Corporation. For ease of reference, in
this opinion we shall employ the term "Monsanto/ Pharmacia"
to refer both to Monsanto Company and to the new combined
Pharmacia Corporation.

claimed were owed to him. In his second amended complaint, Mr. Magin alleged violations of the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., as well as state common law claims for breach of contract, promissory estoppel, promissory fraud and unjust enrichment. The district court granted summary judgment in favor of the defendants. Mr. Magin appealed. After oral arguments, we instructed each party to file a supplemental memorandum setting forth how its position is justified by the text of the Monsanto Company Divestiture Incentive Plan, the Monsanto Company Salaried and Non-Union Hourly Employees' Separation Plan ("Monsanto severance plan") and the Asset Purchase Agreement. For the reasons set forth in the following opinion, we now affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

On September 28, 2000, Monsanto/Pharmacia sold its Kelco biopolymers business ("Kelco Division") to CP Kelco pursuant to an Asset Purchase Agreement.[2] At that time,

---

[2] Several months after closing on its purchase of the Kelco Division, CP Kelco filed suit against Monsanto/Pharmacia in federal district court alleging that Monsanto/Pharmacia had fraudulently induced it to buy the Kelco Division through various misrepresentations. *See CP Kelco U.S., Inc. v. Pharmacia Corp.*, No. 01-240 (D. Del.). Monsanto/Pharmacia filed a counterclaim alleging that CP Kelco had breached the same provisions of the Asset Purchase Agreement that are at issue in this case by failing to pay the former Monsanto/Pharmacia employees their

(continued...)

Mr. Magin was the vice president of the Kelco Division. In an August 1999 letter, Monsanto/Pharmacia advised Mr. Magin of a new pay incentive it was offering in light of the upcoming sale:

> A lot has happened over the last few weeks as we continue the process of preparing the [Kelco Division] for sale. . . . To stay focused on doing the right things for the business and to stay focused on your own personal key performance indicators takes discipline, focus, and yes, even incentives! To the latter point, it is our intent to be sure that the total incentive and compensation opportunity that exists for you at Monsanto is powerful and motivating enough to keep you focused on the task at hand throughout this transition. We hope that the combination of base pay, your annual common incentive plan, stock options, our established severance plans and now, a new <u>Divestiture Incentive Plan</u>, together, accomplish that goal.

R.50, Ex.C-1 at 1. The Divestiture Incentive Plan provided for two types of payments: (1) an incentive payment based on the performance of the Kelco Division up to the closing date of the sale, and (2) a "Go with Buyer" payment. In a second letter, the "Go with Buyer" payment was explained to Mr. Magin as follows:

> [T]he "Go with Buyer" incentive payment will be tied to your employment status in the following manner:
>
> > • if you are offered a comparable job (defined as a job with the same base pay) . . . with the Buyer, you will be eligible for the "Go with Buyer" payment if you

---

[2] (...continued)
full severance. The action has been dismissed by the consent of the parties and with the approval of the district court.

accept the offer and are employed for 12 continuous months following the date of close. The payment will be made 12 months after close. You will not be eligible for any Monsanto severance payment;

- if you are not offered a comparable position (as defined above) with either the new company or with Monsanto, you will be eligible for the Monsanto severance plan following the close of the sale; however, you will not be eligible for any "Go with Buyer" incentive payment;

- your severance will be determined based on negotiations with the Buyer. If your employment is terminated without cause by the Buyer within 12 months of the date of the close of the sale, you will receive no less than an amount equivalent in total to your "Go with Buyer" incentive . . . .,

- if you voluntarily terminate your employment with the Buyer within 12 months of the date of the close of the sale, you will not be eligible to receive the "Go with Buyer" incentive payment . . . .

*Id.*, Ex.C-2 at 1. Soon after the sale of the Kelco Division, Monsanto/Pharamacia paid Mr. Magin a divestiture incentive payment of $250,000. When Mr. Magin was terminated by CP Kelco in February 2001, he requested and received a "Go with Buyer" payment of $65,000.

In addition, while an employee of Monsanto/Pharmacia, Mr. Magin had participated in the Monsanto severance plan. The plan's stated purpose was "to provide limited financial assistance to certain Employees who are Involuntarily Separated from an Employer" while they seek employment. *Id.*, Ex.A-1 at 1. The plan established three categories of severance benefits:

3.1 An Employee who is Involuntarily Separated (other than under Section 2.10(e) [the section of the plan that covers termination for poor performance]) and signs a Waiver shall be eligible to receive Enhanced Benefits.

3.2 An Employee who is Involuntarily Separated (other than under Section 2.10(e)) and does not sign a Waiver shall be eligible to receive Standard Benefits.

3.3 An Employee who is Involuntarily Separated under Section 2.10(e) shall be eligible to receive limited Benefits, regardless of whether or not he executes a Waiver.

*Id.* at 4. The plan defined "involuntary separation" as termination of an Employee's employment with all Employers as a result of one of the following: (a) elimination of the Employee's job with no offer of a comparable job by an Employer; (b) *divestiture by an Employer of the business or location where the Employee is employed with no offer of employment by the purchaser or an Employer;* (c) job elimination with an offer of employment by an Employer which requires relocation (but only if the Employee rejects such offer); (d) expansion of an Employee's position beyond his skills as a result of organizational changes or requirements; or (e) the Employee's Poor Performance.

*Id.* at 3 (emphasis added). "Waiver" was defined as "the Agreement and Release form offered to an Employee who is Involuntarily Separated which releases an Employer from claims arising from such Employee's employment and termination of employment with such Employer." *Id.*

Also, a 1998 Summary Overview of the Monsanto severance plan, explained:

*To what kinds of involuntary separations do the Enhanced and Standard Separation Benefits apply?*

> The Enhanced or Standard benefits are applicable to people who lose their jobs because of one of the following circumstances:
>
> A person's job is eliminated with no offer of a comparable job;
>
> A person's job is eliminated through a divestiture with no offer of comparable job by either the purchaser or Monsanto;
>
> A person's job is eliminated and the comparable job offered requires relocation; or
>
> The person's job has expanded beyond his/her skills as a result of organizational changes or requirements.

*Id.*, Ex.A-2 at 2.

The summary also explained the different types of severance benefits available:

> • Enhanced benefits are provided for certain involuntary separations if the person executes a waiver (Enhanced Separation Benefits).
>
> • Standard benefits are provided for certain involuntary separations and the person refuses to execute a waiver (Standard Separation Benefits).
>
> • Limited benefits are provided for involuntary separations due to inability to perform job. No waiver is required (Limited Separation Benefits).

*Id.* at 1.

The sale of the Kelco Division was governed by an Asset Purchase Agreement. The agreement provided that CP Kelco would offer employment to certain Monsanto/Pharmacia employees and would pay severance to those employees if they were terminated within a year of employment:

Section 6.1 Offers of Employment.

(a) <u>Transferred Employees</u>. No later than 30 days following the date hereof, Buyer shall offer employment . . . with Buyer, effective on the Closing Date, to all of the Employees who are actively employed as of the date of this Agreement . . . . Seller and its Affiliates agree to release from their employment those Employees who are offered and accept employment with Buyer ("<u>Transferred Employees</u>") to enable them to commence their employment with Buyer. Each offer of employment made by Buyer will be in writing (which does not need to be given individually to each Employee but may be given to groups of Employees who are similarly situated) and will at least equal the total compensation opportunity (including the Employee's salary or wages (including, as applicable, shift differentials, incentives and premiums)) provided by Seller to each Employee immediately prior to Closing Date . . . .

(b) <u>Termination of Employees</u>. If Buyer terminates the employment of any Transferred Employee without Cause during the 12-month period following the Closing Date or on such later date on which such Transferred Employee commences work for Buyer (the "<u>Employment Date</u>") and such Transferred Employee is not offered "comparable employment" by Buyer or an Affiliate of Buyer through the 12-month anniversary of the Employment Date, or, if prior to the 12-month anniversary of the Employment Date, Buyer terminates a Transferred Employee who has refused to consent to a request by Buyer for such Transferred Employee to relocate, Buyer shall pay to such Transferred Employee an amount at least equal to the base severance pay that such Transferred Employee would have received under Seller's severance plan disclosed on the Disclosure Schedule upon such a termination of employment of the Transferred Employee by Seller . . . . For purposes of this

Section 6.1(b), "comparable employment" shall mean employment in accordance with Section 6.1(a), above.

*Id.*, Ex.B at 31-32. To reflect that CP Kelco would pay severance benefits as set forth in the Asset Purchase Agreement, Monsanto/Pharmacia and CP Kelco negotiated a $20 million credit on the purchase price for the Kelco Division. *See* R.66, Ex.A at 1.

Following the sale of the Kelco Division, Mr. Magin was transferred to the employ of CP Kelco, where he continued to work until his employment was terminated on February 22, 2001. The termination letter provided to Mr. Magin stated that CP Kelco would pay him severance under its own formula:

> Under the Agreement of Sale, CP Kelco is required to provide to the Monsanto transferred employees severance benefits in "an amount at least equal to the base severance pay under the [Monsanto severance] plan." Under that plan, the "base severance pay" would be equal to 1/4 month's base pay for each year of service. The Hercules Plan provides 2 weeks per year of service, and therefore, CP Kelco will give you the Hercules Plan which will provide greater severance benefit to you. The number of weeks of severance you will receive is 25.29 weeks. Your severance entitlement will be paid in a lump sum in the first pay period in February.

R.104, Tab D ¶ 19. This amount was more than the standard benefits available under the Monsanto severance plan, but less than the enhanced benefits available under that plan. Following his termination from CP Kelco, Mr. Magin filed this suit seeking enhanced severance benefits from *both* CP Kelco and Monsanto/Pharmacia.

**B. District Court Proceedings**

Mr. Magin's second amended complaint raised the following claim against Monsanto/Pharmacia: Count I, ERISA violation due to failure to pay severance benefits under the Monsanto severance plan; Count II, breach of contract for failure to pay an incentive under the Divestiture Incentive Plan; Count III, ERISA violation for failure to pay the divestiture incentive; Count IV, breach of fiduciary duty; Count V, promissory estoppel; Count VI, promissory fraud/detrimental reliance; and Count VII, unjust enrichment. Against CP Kelco, the complaint alleged: Count VIII, ERISA violation due to failure to pay enhanced severance benefits; Count IX, breach of contract; and Count X, unjust enrichment.

On Monsanto/Pharmacia's motion, the district court dismissed the state-law claims against Monsanto/Pharmacia (Counts II, V, VI and VII) as preempted by ERISA. *See* 29 U.S.C. § 1144(a). Monsanto/ Pharmacia then filed a motion for summary judgment on the remaining counts; the district court granted the motion. With respect to Count I, the district court held that Monsanto/ Pharmacia was not liable to Mr. Magin for severance under the Monsanto severance plan because CP Kelco plainly had assumed the duty, under the Asset Purchase Agreement, to pay any severance benefits due to transferred employees that it terminated. The court further determined that Mr. Magin had no standing to claim that Monsanto/ Pharmacia had violated ERISA because, after he was terminated, Monsanto/Pharmacia was not his employer or the administrator of the Monsanto severance plan. *Id.*; *see* 29 U.S.C. §§ 1132, 1002(5), 1002(16).

The district court also ruled that Mr. Magin's claim that Monsanto/Pharmacia had failed to pay him benefits promised under the Divestiture Incentive Plan had no basis

when he had admitted "that he received all payments due to him" under that plan. R.109 at 1. Finally, the court dismissed Mr. Magin's breach of fiduciary duty claim on the basis that ERISA allows plaintiffs to seek money damages only on behalf of the plan, and Mr. Magin was seeking damages *on his own behalf. See* 29 U.S.C. § 1132(a)(1)(B).

The district court also granted CP Kelco's motion for summary judgment. As an initial matter, the court held that Mr. Magin's alternative state-law claims for breach of contract (Count IX) and unjust enrichment (Count X) were preempted by ERISA. With respect to the ERISA claim, the district court recognized that the Asset Purchase Agreement obligated CP Kelco to pay Mr. Magin "an amount at least equal to the base severance pay that [he] would have received under [Monsanto's] severance plan." R.108 at 1. The district court also noted that the Monsanto severance plan entitled an employee to enhanced benefits, as opposed to standard benefits, only if he was "Involuntarily Separated" and "sign[ed] a Waiver." *Id.* The court concluded that Mr. Magin did not qualify for enhanced benefits:

> It is undisputed that Magin did not sign a Waiver. Magin argues that he was never offered a Waiver and was told that he would receive Enhanced Benefits. However, the plain language of the Plan, which defines "Waiver," makes clear that the employer was under no obligation to offer an Involuntarily Separated employee the opportunity to sign a Waiver. Section 2.17 of the Plan states that a " 'Waiver' shall mean the Agreement and Release form *offered to an Employee* who is Involuntarily Separated which releases an Employer from claims arising from such Employee's employment and termination of employment with such Employer."

Under the Plan, Magin had to have been offered a Waiver to be entitled to Enhanced Benefits. Nothing indicates that the employer was required to so offer a Waiver. The language makes it clear that any such offer was at the sole discretion of the employer, and no other interpretation is reasonable. Therefore, as the Plan is unambiguous, this court will not consider any extrinsic evidence. Pursuant to the Plan, a Waiver does not come into existence until it is offered to an employee. Because one was not offered to Magin, he was not entitled to Enhanced Benefits.

*Id.* (citation omitted; emphasis in original). This appeal followed.

## II

## DISCUSSION

### A. Standard of Review

We review a district court's grant or denial of summary judgment de novo. *Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan*, 378 F.3d 669, 680 (7th Cir. 2004). We construe all facts and reasonable inferences from the record in a light most favorable to the nonmoving party. *Id.* Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The claim for separation benefits is really a claim to enforce a contract." *Anstett v. Eagle-Picher Indus., Inc.*, 203 F.3d 501, 503 (7th Cir. 2000). If no genuine issues of material fact are present, then contract interpretation is well-suited for

summary judgment. *Id.*

## B.  Monsanto/Pharmacia

Counts I and IV of Mr. Magin's complaint seek to recover under ERISA the benefits that Mr. Magin claims Monsanto/Pharmacia owes him under the Monsanto severance plan.[3] ERISA entitles a plan "participant or beneficiary" to file a civil action "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). The statute provides that "[a]ny money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter." *Id.* § 1132(d)(2). Even though, in a suit for benefits, the plaintiff ordinarily "should name the plan as a defendant," we have allowed suits against the employer in its role as plan administrator. *Mein v. Carus Corp.*, 241 F.3d 581, 584 (7th Cir. 2001) (citing *Varity Corp. v. Howe*, 516 U.S. 489 (1996)).

On appeal, Mr. Magin argues that he is entitled to enhanced benefits from Monsanto because he did not receive a comparable position at CP Kelco. This argument fails in several respects. First, the governing severance plan of Monsanto speaks simply in terms of an "offer of employ-

---

[3]  Nothing in Mr. Magin's submission on appeal indicates that he challenges the district court's conclusion that the Monsanto severance plan constitutes an ERISA plan for purposes of Counts I and IV, his claims against Monsanto/Pharmacia. Similarly, Mr. Magin has raised no challenge to the district court's ruling that his alternative state-law claims against Monsanto/Pharmacia are preempted by ERISA.

ment." While the summary plan description does use the term "comparable," it does not employ the term as a distinguishing factor between enhanced and standard benefits. In any event, by acceptance of "Go with Buyer" benefits, which are conditioned on the employee receiving a comparable position with the purchaser, Mr. Magin is in effect estopped from making any claim to the contrary here.

Mr. Magin also submits that the sale of the Kelco Division to CP Kelco triggered Monsanto/Pharmacia's obligation to pay him benefits under the Monsanto severance plan. Specifically, he claims that he became eligible for severance benefits on the date of the sale because, even though he had no period of unemployment, his employment with Monsanto/Pharmacia was terminated in order for him to be placed on the CP Kelco payroll.[4] Monsanto/Pharmacia acknowledges that it released Mr. Magin from its employ-

---

[4] To support his submissions, Mr. Magin relies on *Anstett v. Eagle-Picher Industries, Inc.*, 203 F.3d 501 (7th Cir. 2000). In *Anstett*, we held that the plaintiffs were entitled to severance benefits because they were "terminated" when the employer sold their division to another corporation, even though the plaintiffs had been reemployed immediately by the buyer. *Id.* at 502-03. Our conclusion rested on the specific language of the plan at issue and the particular facts, which included: (1) that the seller knew that a sale of a division could trigger severance benefits absent language in the policy limiting eligibility; (2) that the seller presumably had negotiated the purchase price based on the expectation that it would pay the separation benefits; and (3) that the buyer did not offer the employees a comparable separation benefits package. *Id.* at 505-06. In such circumstances, we noted, the seller would reap a windfall if not held to its obligation to pay severance. *Id.* at 506. Moreover, we were concerned that the employees be protected from the "possibly precarious employment future" with the buyer. *Id.*

ment on the day of the sale, September 28, 2000, so that he could commence his employment with CP Kelco. However, CP Kelco assumed the duty to pay severance to employees who were transferred to CP Kelco and whose employment CP Kelco terminated within twelve months of employment. CP Kelco specifically agreed to pay such employees severance benefits in an amount at least equal to the base severance pay that they would have received under the Monsanto severance plan. R.50, Ex.B at 32 ("Buyer shall pay to such Transferred Employee an amount at least equal to the base severance pay that such Transferred Employee would have received under Seller's severance plan."). Indeed, CP Kelco received a $20 million credit against the purchase price of the Kelco Division for the purpose of paying severance benefits to employees transferred from Monsanto/Pharmacia. It is undisputed that Mr. Magin's employment was transferred to CP Kelco and that his "pay remained the same" at CP Kelco. R.76, Ex.B at 47.

By contrast to *Anstett*, awarding severance would constitute a windfall to Mr. Magin when Monsanto/ Pharmacia sought to protect its transferred employees by requiring CP Kelco to provide them severance in exchange for a reduced sale price, when Mr. Magin suffered no period of unemployment, and when he received separation benefits from CP Kelco. In short, because CP Kelco contractually assumed the obligation to provide severance benefits to transferred employees who accepted employment with CP Kelco and were terminated within twelve months of their employment, CP Kelco alone is liable to Mr. Magin under the Monsanto severance plan. Therefore, the district court's grant of summary judgment on Count I was appropriate.

Mr. Magin also contends that Monsanto/Pharmacia breached a fiduciary duty under ERISA by misrepresenting to him that he would receive enhanced severance benefits if

he stayed employed through the sale of the Kelco Division. The district court properly dismissed this claim. "ERISA allows for an action to enforce and seek appropriate relief because of a breach of fiduciary duty." *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 992 (7th Cir. 1993); 29 U.S.C. § 1132(a)(2). Recovery from such actions, however, must go to the plan as a whole, and not the individual beneficiary. *Id.* (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985)). Mr. Magin correctly notes that he can maintain an individual cause of action for equitable relief, *see Varity Corp.*, 516 U.S. at 515; 29 U.S.C. § 1132(a)(3), but that is not what he seeks. Rather, he seeks to recover his personal enhanced severance benefits from Monsanto/Pharmacia.

### C. CP Kelco

Mr. Magin maintains that the district court erred by granting CP Kelco summary judgment because "CP Kelco owed enhanced severance if the employee elected to sign any tendered waiver." Reply Br. at 4. Section 6.1(b) of the Asset Purchase Agreement provided that

> [i]f Buyer terminates the employment of any Transferred Employee without Cause during the 12-month period following the Closing Date or on such later date on which such Transferred Employee commences work for Buyer (the "Employment Date") and such Transferred Employee is not offered "comparable employment" by Buyer or an Affiliate of Buyer through the 12-month anniversary of the Employment Date . . . Buyer shall pay to such Transferred Employee an amount at least equal to the base severance pay that such Transferred Employee would have received under Seller's severance plan disclosed on the Disclosure Schedule

upon such a termination of employment of the Transferred Employee by Seller . . . .

R.50, Ex.B at 32. The Monsanto severance plan, in turn, provided enhanced separation benefits only to an employee "who is Involuntarily Separated . . . and signs a Waiver." *Id.*, Ex.A-1 at 4; *see also id.*, Ex.A-2 at 1 (Summary Overview) ("Enhanced benefits are provided for certain involuntary separations if the person executes a waiver . . . ."). A "waiver" in turn referred to "the Agreement and Release form *offered to an employee* who is Involuntarily Separated which releases an Employer from claims arising from such Employee's employment and termination of employment with such Employer." *Id.* (emphasis added).

We agree with the district court's conclusion that the unambiguous terms of the Monsanto severance plan make it clear that offering an involuntarily separated employee the option to sign a waiver was "at the sole discretion of the employer." R.109 at 1. Mr. Magin was not offered a waiver, and he not did sign a waiver; accordingly, summary judgment against his claim under ERISA for *additional* severance from CP Kelco was appropriate.[5]

---

[5] For the first time in his reply brief, Mr. Magin submits that the district court erred by holding that ERISA preempted his state-law claims for breach of contract and unjust enrichment against CP Kelco. Specifically, he maintains, in a conclusory way, that the Monsanto severance plan is not an ERISA plan because it did not require the employer to maintain an ongoing administrative program to meet its obligation. *See* Reply Br. at 11 (citing *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11-12 (1987)). We see no merit to this contention. In any event, even if Mr. Magin could state a cognizable state-law claim, the claim would fail by virtue of our holding that CP Kelco was not obligated to pay him enhanced severance benefits.

(continued...)

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

(...continued)

---