**Joe F. BROWN, Plaintiff,**

v.

**ORANGE & ROCKLAND UTILITIES, INC., Defendant.**

**No. 05 Civ. 4896(SCR).**

United States District Court, S.D. New York.

Jan. 21, 2009.

Michael Howard Sussman, Sussman & Watkins, Goshen, NY, for Plaintiff.

Eva Lucia Martinez, Con Edison Law Department, New York, NY, for Defendant.

## AMENDED MEMORANDUM DECISION AND ORDER

STEPHEN C. ROBINSON, District Judge.

Plaintiff, Joe F. Brown, filed this action against Orange & Rockland Utilities, Inc., ("Rockland"), alleging that Rockland violated 42 U.S.C. § 1981 and the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 et seq., by creating a hostile work environment and by constructively discharging Mr. Brown based on his race. Rockland has filed a motion for summary judgment, and that motion is fully briefed.

For the reasons set forth in this opinion, the Court grants in part and denies in part Rockland's motion for summary judgment.

## I

### BACKGROUND

#### A. Facts

Mr. Brown, who is African–American, began his employment with Rockland in 1982 at an entry-level union job title. Between 1982 and his retirement in 2005, Mr. Brown was disciplined five times. In 1997, Mr. Brown's supervisor signed a statement explaining that Mr. Brown had told him that he suffered from a chemical imbalance "caused by the medication and testing associated with his cancer operation," *see* Declaration of Thomas J. Evans ("Evans Decl.") ¶ 33.

In 1998, Mr. Brown was awarded the position of stockhandler in the Spring Valley Stores Department (the "Stores Department"). The Stores Department is responsible for buying and distributing all materials and supplies for Rockland; this particular Stores Department was Rockland's largest, with approximately eight employees and two managers. Mr. Brown's duties included loading, unloading, handling delivery of materials, and keeping inventory of stock items. For many years, Mr. Brown was one of two African–American employees working in the Stores Department; after 1999, however, Mr. Brown was the only African–American.

In 2002, Mr. Brown was promoted to the position of assistant storekeeper. In this capacity, he kept his stockhandler responsibilities and acquired additional duties, including distributing and directing the work assignments, when necessary, of individuals holding subordinate union job titles. Mr. Brown occasionally worked with an employee named Kevin Pfeil, who is Caucasian and also was employed as a stockhandler. In 1997, Mr. Brown began having a difficult relationship with Pfeil. The cause of this difficulty, according to Mr.

Brown, was that Pfeil would tell Mr. Brown what to do; Mr. Brown also felt that Pfeil was "harsh" with him and "gave him a hard time." Affidavit of Michael Sussman ("Sussman Aff."), Exh. 1 at 27. Although Pfeil left the Stores Department for several years, he returned in the fall of 2002 in the position of storekeeper; during this time, Mr. Brown continued to serve as assistant storekeeper.

According to Rockland, Pfeil was a union foreman who directed work only if and when necessary. It contends that unless there was a special assignment, Pfeil had no need to issue daily assignments to Mr. Brown. Both Mr. Brown and Pfeil reported to the Stores Department supervisor Robert Huber, who was responsible for evaluating performance, administering discipline, and managing day-to-day operations. In addition, Doug Morris, another Stores Department supervisor, primarily handled the administrative functions of the Stores Department operation and shared the responsibility with Huber for supervision of the union employees. Mr. Brown points out, however, that Pfeil, who held the title of storekeeper, was in a higher position than Mr. Brown, who held the title of assistant storekeeper.

Part of Mr. Brown's hostile work environment claim is predicated on his contention that, beginning in 2002, Pfeil began accusing Mr. Brown of stealing company property and also began spreading rumors to that effect. At his deposition, Mr. Brown testified that he overheard conversations about Pfeil's accusations. For example, Mr. Brown testified:

Q. What was it that you overheard between Kevin [Pfeil] and Tom [Bremwich], what was being discussed?

A. Well, I didn't catch the conversation. I didn't listen to the conversation because when they saw me coming they stopped.

Q. What did you hear?

A. I can't remember. It's been so long.

Q. So how do you know they were discussing you?

A. Their attitudes.

Q. I don't understand what that means, describe their attitudes?

A. If someone's talking about you and you walk up they stop, right? If they don't see you and you turn he corner and you overheard things you know they're talking about you. If you heard it—I mean, I can't say, yes, he's calling me by name, all right? But what reason would he— if he wasn't talking about me why stop?

Q. So you don't know for certain they were talking about you but you believe they were because they stopped talking when you approached; is that correct?

A. Something to that effect, yes.

Sussman Aff., Exh. 1 at 36–37. In early 2003, Mr. Brown reported to the two Stores Department supervisors that Pfeil had been accusing him of stealing company materials. All together, Mr. Brown made four of these complaints to his superiors.

In one such complaint, Mr. Brown claimed to Huber that Pfeil had blamed him (Mr. Brown) for stealing certain misplaced work gloves; Mr. Brown also told Huber that the gloves had been recovered in the mailroom. Huber claims that he was surprised by Mr. Brown's complaint, and Mr. Brown admits that Huber told him that "nobody blamed that on you." Declaration of Eva L. Martinez ("Martinez Decl."), Exh. C at 183. Mr. Brown also told Huber and Morris that he had been hearing rumors that his coworkers were accusing him of stealing. Mr. Brown,

however, did not provide the names of any employees who he claimed were making these accusations or who had told him that they had heard that he had been stealing.

Huber claims that, after Mr, Brown complained to him about the rumors, he met with Pfeil and other employees, but he was unable to substantiate any of Mr. Brown's claims. Although Huber was told by at least one employee that Mr. Brown had told him that someone had been spreading these rumors, Huber did not find that anyone knew or had heard of these rumors independent of what Mr. Brown told them. *Id.*, Exh. D at 22–23. Subsequently, Huber asked Mr. Brown whether he wanted someone from the Human Resources Department to conduct a formal investigation into the rumors that Mr. Brown claims were being spread by Pfeil. Mr. Brown declined, stating that he would attempt to resolve the matter through the union.

Rockland contends that these rumors were a figment of Mr. Brown's imagination, and it claims that Mr. Brown became obsessed with proving that he was not stealing from the Stores Department. For example, Rockland explains, Mr. Brown admitted that he lied to Ed Pelton, a co-worker, about needing help installing a hot tub at his home—a hot tub that he had not purchased—just so that he could show Pelton that he was not in possession of any stolen materials. *Id.*, Exh. C at 85–87. In addition, Mr. Brown brought Morris, one of the Stores Department supervisors, to his house and showed him his work shed to prove that he had not stolen any materials. Rockland notes that Mr. Brown never received *any* disciplinary action for, nor does he contend that any Rockland officials ever confronted him about, any alleged stealing.

Throughout this time period, Mr. Brown also claims that many individuals at work began avoiding him. Although these indi-viduals often would go into Pfeil's office to sit down and chat, Mr. Brown was left out of these activities. By May 2004, for example, Mr. Brown claims that his coworkers would walk out of the cafeteria when he walked in. He further claims that individuals would not speak to him in the cafeteria if Pfeil was there. Mr. Brown claims that these rumors about him stealing where being spread by Pfeil and that individuals at work were snubbing him (at Pfeil's insistence) because he was an African–American. At his deposition, Mr. Brown testified about Pfeil's motivations:

Q. So he didn't make any comments blatantly, he didn't say anything that you construed as racist, you referred to his mannerisms, what about his mannerisms made you believe that his conduct towards you was based on your race.?

A. I can't put my finger on it. I can't put my finger on it.

Q. So what else, tell me what else is there, I mean, you believe it was in part at least because of your race?

Q. Yes.

A. And I want to understand why it is that you felt that?

Q. He didn't treat nobody else that way. He treated nobody else that way. He didn't make no accusations against nobody that I heard of, that I heard but me. But it's really funny that from '97 to 2000 [when Pfeil was not employed at the Stores Department] there was no problems in Stores, none whatsoever . . . .

Sussman Aff., Exh. 1 at 97.

After Mr. Brown notified Huber and Morris about the rumors, in approximately March or April 2003, Mr. Brown claims that he began receiving phone calls every evening to his home at night. Mr. Brown

requested a meeting with Union Business Representative James Humphrey to discuss his concerns. Humphrey held a meeting with the entire Spring Valley Stores Department union workforce, including Pfeil. Mr. Brown was given an opportunity to discuss his allegations about the rumors allegedly being spread about him and the phone calls that he allegedly had been receiving at his home. Upon accusing Pfeil of making these phone calls, Mr. Brown claims that Pfeil smiled and laughed. (Pfeil, along with other Rockland employees, deny making these phone calls or spreading any rumors.) Eventually, either Mr. Brown stepped out of the room or he was asked to do so. Upon returning, Humphrey explained to Mr. Brown that his complaints had not been substantiated. Mr. Brown claims that he stopped receiving the phone calls after this meeting.

Pfeil claims that after this meeting, and in an effort to avoid having any further accusations levied at him, he attempted to limit his interactions with Mr. Brown. Pfeil also recommended that, aside from working together, other employees limit their interactions with Mr. Brown.

In May 2003, Mr. Brown raised the same complaints with Elaine Farley, who worked in Rockland's Human Resources Department. Farley claims that Mr. Brown stated that these allegations were *not* based upon his race.[1] Martinez Decl., Exh. E at 79. Mr. Brown did not provide any documentation or evidence, such as a caller ID log, regarding the phone calls that he claims to have been receiving. Farley conducted an investigation in which she interviewed each individual employee, including Pfeil and Mr. Brown, at the Stores Department. Farley was largely unable to substantiate any of Mr. Brown's complaints regarding the pervasive rumors that he claims were circulating about him or the phone calls that he had been receiving at his home. Farley's notes indicate, however, that there was one rumor about Mr. Brown. Pfeil said that there was one incident at another plant, when Mr. Brown had worked there, in which a truckload of plywood had been stolen, and some employees believed that Mr. Brown had been involved.

After her investigation, Farley held a meeting and made numerous suggestions regarding how the Stores Department could work better together. For example, Farley claims that she explained to all the employees that there was no evidence that Mr. Brown had been stealing anything from the Stores Department and that the continuation of these rumors, if they in fact were being spread, would contribute to an unproductive atmosphere. Farley also informed the employees that the Stores Department was secured with an upgraded surveillance system that would assist in identifying instances of theft and that there was no evidence that Mr. Brown had been stealing. Farley also took Mr. Brown aside; she explained to him that, if the rumors continued and he was able to provide the names of witnesses who could corroborate his allegations, he should contact her for further investigation.

After Farley's investigation, Rockland contends that Mr. Brown continued to complain to his coworkers that he was being accused of theft. Rockland contends that Mr. Brown's behavior was causing a breakdown in the work environment at the Stores Department. For example, notes Rockland, Mr. Brown began to complain

---

1. Rockland also claims that Mr. Brown, in a conversation with Huber, denied that his allegations were based on racial discrimination. Mr. Brown, however, denies that this conversation with Huber took place and that he ever told Huber that his complaints were unrelated to his race. Affidavit of Joe Brown ("Brown Aff."), ¶ 8.

that he was being followed and watched by Rockland employees after work. On one occasion, Mr. Brown complained that a car from Rockland had followed him to a restaurant and then drove away when Mr. Brown parked his car. He also told Rockland officials—presumably in an effort to prove that he was not stealing—that he had self-registered with an agency called the Bureau of Criminal Investigation, which allowed his car to be randomly stopped and searched at any time; Mr. Brown concedes that he said this but claims that he did not in fact register. Finally, Mr. Brown advised Rockland that he was going to schedule a lie detector test to prove that he was not stealing. Rockland contends that several employees were complaining about Mr. Brown's constant allegations and were expressing their concern that it was a distraction to the workforce.

In December 2003, Mr. Brown reported to Rockland's Vice-President that he was being accused of stealing and had not been able to obtain redress. Mr. Brown subsequently met with the Stores Department manager, the director of human resources, and two supervisors. At the meeting, Mr. Brown described his complaints and asked for action to resolve the alleged rumors.

On March 1, 2004, Mr. Brown was called into another meeting by Rockland officials. Mr. Brown was informed that he was causing disruptions in the workforce and that he was creating a hostile work environment for others. Mr. Brown contends that he was directed to go home sick. At this point, Mr. Brown lost his temper and began yelling. Thomas J. Evans, who was Rockland's director of labor relations and participated in this meeting, states that several times Mr. Brown yelled, "I may be paranoid, but I'm not crazy." Evans Decl. ¶ 10.

Ultimately, Rockland officials directed Mr. Brown to Dr. Alan Tuckman, a psychiatrist. Dr. Tuckman recommended that Mr. Brown return to work as long as he agreed to attend anger management sessions. Dr. Tuckman concluded that Mr. Brown, who had described himself as paranoid to Dr. Tuckman, was suffering from "Depressive Disorder with Paranoid Features, possibly precipitated by a host of medical problems over the last several years." Id. ¶ 12. After ten weeks out of work on disability leave and after complying with the demand that he attend anger management sessions, Rockland advised Mr. Brown that he could return to work. Mr. Brown notes that during his ten week absence, his coworkers never called him, despite knowing that he was out sick.

After returning to work, Mr. Brown claims that he continued to hear rumors that he had been stealing. Mr. Brown further relates that he was ignored by his coworkers and that he believes that this shunning was due to his race. On one occasion, Mr. Brown overheard his coworkers talking disparagingly about Jews and "Orientals," and this caused him to believe that they spoke disparagingly about African–Americans behind his back.

On two occasions after his return to work, Mr. Brown had harsh words with a white coworker named Keith Bonne, who Mr. Brown claims usually shunned him. After each of his two verbal altercations with Bonne, Mr. Brown observed what he describes as two nooses hanging from the rafters of the warehouse. Mr. Brown believes that Bonne put the nooses up. After seeing the two nooses, Mr. Brown went to Pfeil, who immediately took them down on each occasion. Pfeil, however, did not convene a meeting to discuss this conduct.

Mr. Brown explains that, in 1997, prior to his arrival at the Stores Department, there was a loop of rope that he also

describes as a noose already hanging from the rafters. Mr. Brown claims that the rope never bothered him and that he barely had noticed it until a coworker named Helen pointed it out to him.

In late January 2005, Mr. Brown observed Bonne taking a box out of the back door of the warehouse. He asked Pfeil whether Bonne had permission to remove a box from the storeroom, and Pfeil told him no. Mr. Brown claims that Pfeil did nothing to confront Bonne about this conduct. At the monthly staff meeting, Mr. Brown attempted to bring up Bonne's conduct, but neither Huber nor Morris wanted to discuss the matter. Mr. Brown claims that this made him angry, given all of the accusations of stealing that he claims that he had endured.

After the meeting, Mr. Brown followed Huber and Morris into an office. He raised his voice at them, telling them that, if someone had seen him taking a box out of the storeroom, they probably would have had the National Guard at the front gate to strip search him. The next day Mr. Brown apologized to Huber and Morris because he felt that he had gone too far.

On January 28, 2005, the same day of Mr. Brown's apology, Humphrey, the union representative, approached Mr. Brown and made him an offer on behalf of Rockland. Humphrey explained to Mr. Brown that Rockland was offering to allow him to leave on vacation until his retirement on April 1, 2005, a date for which Mr. Brown had petitioned Rockland in December 2004. Alternatively, Humphrey explained, Rockland would suspend him without pay pending disciplinary action for his actions in yelling at Huber and Morris. Mr. Brown refused to take the vacation offer; he told Humphrey that he would go home on suspension.

Evans suspended Mr. Brown effective January 28, 2005. On January 31, 2005, the union filed a grievance on behalf of Mr. Brown. Rockland and the union subsequently entered into negotiations, and the parties agreed that Rockland would pay Mr. Brown sick time for the period from February 2, 2005, through March 31, 2005, with time not worked on January 28, January 31, and February 1, 2005, as suspended time without pay. Mr. Brown signed an irrevocable letter of retirement affirming the April 1, 2005, retirement date. Mr. Brown retired effective April 1; he is collecting his full pension and an $800 supplement for retiring at the age of 60.

Mr. Brown claims that he retired from Rockland due to the constant accusations and rumors that he had endured, a situation that Rockland would not help remedy. Mr. Brown submits that, absent this conduct, he would not have retired in 2005.

## B. Procedural Posture

Mr. Brown filed this action against Rockland alleging that Rockland violated 42 U.S.C. § 1981 and the NYHRL, N.Y. EXEC. LAW § 290 et seq., by creating a hostile work environment and by constructively discharging Mr. Brown based on his race. Rockland has filed a motion for summary judgment, and that motion is fully briefed.

## II

## DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "there is no genuine issue as to any material fact." FED.R.CIV.P. 56(c). Summary judgment is inappropriate unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Magin v. Monsanto Co.,* 420 F.3d 679, 686 (7th Cir.2005) (citing FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In conducting this inquiry, all facts and reasonable inferences must be construed in favor of the non-moving party, here, Mr. Brown. *Magin,* 420 F.3d at 686. This Court does not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, the Court determines whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Rather, the non-moving party must show that there is evidence upon which a jury reasonably could find for the plaintiff. *Id.*

### B. 42 U.S.C. § 1981

#### 1. Hostile Work Environment Claim

Title 42, section 1981 of the United States Code provides that

all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

"Section 1981," the Second Circuit has explained, "provides a cause of action for race-based employment discrimination based on a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000). A hostile work environment claim is analyzed using the standards developed under Title VII of the Civil Rights Act of 1964.[2] *See id.* (citing *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 347 n. 2 (7th Cir.1999)).

■ To establish a prima facie case of a hostile work environment discrimination and defeat a motion for summary judgment, "a plaintiff must produce evidence that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted). The determination of whether the conduct alleged was so severe or pervasive to alter the conditions of employment, the Supreme Court has held, must be made based on "the totality of the circumstances." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Factors bearing on this inquiry, the Justice have explained, include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or hu-

2. 42 U.S.C. § 2000e et seq.

miliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id.* at 23, 114 S.Ct. 367.

■ It is " 'axiomatic' that in order to establish a [race]-based hostile work environment [claim] . . . a plaintiff must demonstrate that the conduct occurred because of her [race]." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002). It is insufficient, moreover, for a plaintiff merely to establish that he believed that the alleged conduct was hostile or abusive; the plaintiff also must adduce evidence from which a reasonable jury could find that the work environment was objectively hostile or abusive. *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007). Finally, a court may not decide as a matter of law a hostile work environment claim if "reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004).

### a.

Rockland contends that summary judgment is appropriate with respect to Mr. Brown's hostile work environment claim because he has failed to proffer sufficient evidence that the acts upon which he has predicated his claim occurred because of his race. A review of the complaint and Mr. Brown's statement of facts and memorandum of law reveals that he has predicated his hostile work environment claim on conduct that may be grouped as follows: first, the rumors, allegedly spread by Pfeil, that Mr. Brown was stealing materials from the Stores Department; second, the phone calls that Mr. Brown allegedly received at his home; third, the two instances where Mr. Brown claims that, after having verbal altercations with

Bonne, a coworker, Bonne put up nooses from the rafters; fourth, derogatory comments made about Jews and "Orientals" by some of Mr. Brown's coworkers; fifth, the coworkers' conduct in shunning Mr. Brown. Because there is no dispute that the derogatory comments and the nooses are connected to race, the Court shall confine its review of Rockland's argument to the alleged rumors, phone calls, and shunning of Mr. Brown.

■ Mr. Brown has not adduced sufficient evidence to link this conduct to his status as an African–American. As a preliminary matter, the Court must observe that Mr. Brown did not complain to anyone at Rockland about race-based discrimination. Indeed, although he denies having told Huber, his supervisor, that his complaints were unrelated to his race, Mr. Brown has not denied that he told Farley, the Rockland official investigating the alleged rumors and phone calls, that his complaints were not based on race. Martinez Deck, Exh. E at 79. Moreover, and more important, Mr. Brown does not claim that Pfiel, the individual that he claims was instigating the theft rumors, making the nightly phone calls, and encouraging coworkers to shun him, made any comments suggesting that he bore animus toward Mr. Brown because of Mr. Brown's race; in fact, Mr. Brown conceded that Pfiel had not directed any race-based comments toward him. Sussman Aff., Exh. 1 at 90. Pfeil also has asserted a nondiscriminatory reason for avoiding Mr. Brown—he testified that, in an effort to avoid having any further accusations levied at him by Mr. Brown, he attempted to limit his interactions with Mr. Brown and suggested that other employees do the same—and Mr. Brown has not introduced any evidence to undermine Pfeil's reason. Although Mr. Brown clearly believes that Pfeil allegedly engaged in this conduct because of Mr.

Brown's race, when he was asked to elaborate on the foundation for his belief, Mr. Brown stated: "I can't put my finger on it. I can't put my finger on it." *Id.* at 97. Mr. Brown was asked: "What's your basis for believing that [Pfiel]'s accusations against you were because you're black?" *Id.* at 90. Mr. Brown answered:

> I can't answer that. I can't say because he called me any names, no. But for what other reason would he treat me this way? I never did nothing to him. Why start these rumors, all right? You know, if I dislike you why not just have nothing to do with me. Why start rumors? Just don't have nothing to do with me. If I was your supervisor I would tell you, look, this has to be done, that has to be done, that has to be done and leave it at that. If I don't do it then you go to your boss. He never did that. He never did that.

*Id.* These conclusory and speculative statements are insufficient to allow a reasonable trier of fact to conclude that the alleged rumors, phone calls, and shunning were due to Mr. Brown's race.[3] *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."). Because Mr. Brown has not adduced sufficient evidence to link the alleged rumors, phone calls, and shunning to his race, he may not rely on this conduct in establishing his section 1981 hostile work environment claim.

### b.

Rockland's next contention is that the remaining conduct about which Mr. Brown complains—the derogatory comments about Jews and "Orientals" made by Mr. Brown's coworkers and the nooses allegedly put up by Bonne—is insufficiently severe or pervasive to establish a hostile work environment claim.

█ Assuming that Bonne put up two nooses after having words with Mr. Brown, as this Court must given the posture of this case, many courts have found such conduct deeply troubling and often sufficient in itself to allow a finder of fact to conclude that the plaintiff was subjected to a hostile work environment. *Tademy v. Un. Pacific Corp.,* 520 F.3d 1149, 1159 (10th Cir.2008) (citing *Hollins v. Delta Airlines,* 238 F.3d 1255, 1256–58 (10th Cir. 2001); *Vance v. S. Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1511 n. 4 (11th Cir.1989), *abrogated on other grounds by, Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); and *Vance v. S. Bell Tel. & Tel.,* 983 F.2d 1573, 1583 (11th Cir.1993) (Fay, J., dissenting)); *Bailey v. USF Holland, Inc.,* 526 F.3d 880, 883–87 (6th Cir.2008); *Wilson v. New York City Dep't of Transp.,* No. 01 Civ. 7398, 2005 WL 2385866, at *21–22 (S.D.N.Y. Sept. 28, 2005) (denying summary judgment on a hostile work environment claim because the plaintiff had received "noose

---

**3.** The Court notes that Mr. Brown has neither alleged nor proffered any evidence to suggest that Pfeil was involved in putting up the nooses—he claims that Bonne was responsible—and, indeed, Mr. Brown concedes that Pfeil immediately removed the nooses when Mr. Brown told him about them. In addition, Bonne's conduct postdated by at least one year the alleged rumors and phone calls that Mr. Brown attributes to Pfeil. Thus, although the Court is aware of the danger of analyzing discriminatory conduct in parts rather than in its totality, Mr. Brown has adduced *no* evidence linking Bonne's alleged (and, if true, clearly discriminatory) behavior to Pfeil's alleged behavior.

[which was put] outside his locker" and "a picture of a noose"); *Williams v. New York City Housing Auth.*, 154 F.Supp.2d 820, 824 (S.D.N.Y.2001) ("Indeed, the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence. It is impossible to appreciate the impact of the display of a noose without understanding this nation's opprobrious legacy of violence against African–Americans."). Consequently, this Court finds that Mr. Brown's allegations that two nooses were put up and targeted at him are sufficient to defeat a motion for summary judgment on a hostile work environment claim.

**c.**

■ Mr. Brown's hostile work environment claim, however, faces a more difficult hurdle. Mr. Brown alleges that Bonne put up the two nooses, but he has not named Bonne as a defendant in this action. Rather, Mr. Brown brought the action against Rockland, in its capacity as Bonne's employer. To prevail on his section 1981 action against Rockland, Mr. Brown must establish that there is a "specific basis . . . for imputing the conduct that created the hostile work environment to the employer." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996). Because in this case the alleged harassment was by Bonne, a coworker,[4] Mr. Brown must establish that Rockland " 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' " *Whidbee*, 223 F.3d at 69 (quoting *Van Zant*, 80 F.3d at 715).

■ Whether an employer is charged with knowledge—either actual or constructive—of harassment is determined by agency principles, the Second Circuit has

explained. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63–64 (2d Cir.1998); *see also Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir.1997). The Second Circuit has held that, under principles of agency law, an employer will be charged with knowledge of harassment when

> a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or b) the official is charged with a duty to act on the knowledge and stop the harassment; or c) the official is charged with a duty to inform the company of the harassment.

*Torres*, 116 F.3d at 636–37 (internal quotation marks and citations omitted). Management level employees

> encompass two groups of persons: first, supervisors possessing substantial authority and discretion to make decisions concerning the terms of the harasser's or harassee's employment; and second, non-management employees charged with substantial responsibility for relaying employee complaints to management, particularly where management is located away from the workplace. If a co-worker has knowledge of a harassee's complaint, but that co-worker lacks authority to counsel, investigate, suspend, or fire the accused harasser, or to change the conditions of the harassee's employment, the co-worker's inaction does not spark employer liability unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions.

*Id.* at 637 (citation omitted) (emphasis omitted).

---

4. In contrast, where the alleged discrimination is attributable to a supervisor, an employer is vicariously liable. *Faragher v. City of*

*Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■] Finally, the burden is on Mr. Brown to establish that there is a specific basis for imputing knowledge of harassment to Rockland. *Id.* at 636. Of course, in analyzing the issue of imputation, the Court must keep in mind the procedural posture of this case. In reviewing a motion for summary judgment, all facts and reasonable inferences must be construed in favor of the non-moving party, here, Mr. Brown. *Magin,* 420 F.3d at 686; *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63–64 (2d Cir.1992) (reversing because there were genuine issues of triable fact as to whether the harassment could be imputed to the employer). This Court does not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, the Court determines whether there exists a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. With the foregoing principles in mind, the Court turns to the question whether Rockland provided Mr. Brown with no reasonable avenue for complaint about Bonne's harassment and, given the principles of agency law, whether Rockland can be charged with knowledge of Bonne's harassment.

### i.

Rockland provided Mr. Brown with a reasonable avenue for complaint about the harassment. Rockland maintains a written policy that establishes fairly comprehensive procedures and guidance regarding workplace behavior, discrimination, and the proper handling of discrimination claims at the supervisory level. Evans Deck, Exh. A at 1–2. In addition, Rockland has established that it investigated Mr. Brown's repeated complaints about the rumors Pfeil allegedly had been spreading and about the nightly phone calls that Mr. Brown had been receiving; indeed, Farley, the Human Resources employee who had investigated Mr. Brown's previous complaints, explained to Mr. Brown that, if the rumors continued and he was able to provide the names of witnesses who could corroborate his allegations, he should contact her for further investigation. Moreover, Huber and Morris, the Stores Department supervisors made themselves available repeatedly to Mr. Brown when Mr. Brown had complaints about these incidents. Accordingly, the Court concludes that Rockland provided Mr. Brown with a reasonable avenue of complaint.

### ii.

■ Upon seeing the nooses that he claims that Bonne put up, however, Mr. Brown did not notify Huber, Morris, or Farley. Instead, he notified Pfeil, who immediately took the nooses down. The question, therefore, is whether Rockland may be charged with constructive knowledge of Bonne's harassment because Mr. Brown notified Pfeil. After reviewing the record evidence and the parties' submission, the Court concludes that there is a genuine issue of material fact as to whether Rockland can be charged with constructive knowledge of Bonne's harassment due to Pfeil's knowledge of the nooses. Pfeil held the position of storekeeper—a position that is higher in Rockland's chain-of-command, as it were, than Mr. Brown, who held the position of assistant storekeeper. When the record evidence is viewed in the light most favorable to Mr. Brown, it indicates that Pfeil was responsible for directing work at the warehouse and giving out special assignments. Sussman Aff., Exh. 2 at 6; *id.,* Exh. 3 at 13; Martinez Decl., Exh. D at 6. In addition, Pfeil was the individual that Mr. Brown notified, on both occasions, of the nooses that Bonne allegedly put up; Mr. Brown also notified Pfeil when he observed Bonne taking a box out of the back door of the warehouse, asking

Pfeil whether Bonne had permission to remove a box from the storeroom. These facts are probative of the agency relationship between Mr. Brown and Pfeil and, more important, tend to show that Pfeil was a liaison of sorts between lower-level employees and supervisors such as Huber and Morris.

Rockland, moreover, has not submitted any evidence on summary judgment that would foreclose a jury from finding that Pfeil had the requisite responsibility over Mr. Brown—for example, evidence showing that storekeepers do *not* have the responsibility to report information or incidents of harassment up the chain-of-command. *See Torres,* 116 F.3d at 636–37 (noting that management level officials include "non-management employees charged with substantial responsibility for relaying employee complaints to management, particularly where management is located away from the workplace"). Consequently, under principles of agency law, this Court concludes that genuine issues of material fact remain as to whether Rockland ought to be charged with knowledge of Bonne's harassment. Accordingly, the Court denies Rockland's motion for summary judgment with respect to Mr. Brown's hostile work environment claims.

## 2.  Constructive Discharge Claim

■■■■ Rockland also seeks summary judgment with respect to Mr. Brown's constructive discharge claim. The Second Circuit has explained that " '[a]n employee is constructively discharged when his employer, rather than discharging him directly, *intentionally* creates a work atmosphere so intolerable that he is forced to quit involuntarily.' " *Petrosino v. Bell Atl.,* 385 F.3d 210, 229 (2d Cir.2004) (*Terry v. Ashcroft,* 336 F.3d 128, 151–52 (2d Cir. 2003)) (emphasis added). Although some

showing of intentionality is required, a plaintiff need not show "specific intent"; rather, "if a plaintiff suing for constructive discharge cannot show specific intent, [then] he or she must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligen[t] or ineffective [ ].' " *Id.* at 229–30 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 74 (2d Cir.2000)).

■■■ In the present case, Mr. Brown predicates his constructive discharge claim upon the same conduct that serves as the basis for the hostile work environment claim. This Court has concluded, however, that Mr. Brown has not adduced sufficient evidence, to defeat a motion for summary judgment, that some of this conduct—namely, the rumors, allegedly spread by Pfeil, that Mr. Brown was stealing materials from the Stores Department, the phone calls that Mr. Brown allegedly received at his home, and the employees' shunning of Mr. Brown—was related to Mr. Brown's race. *See supra* Part II.B.1.a. With respect to the remaining conduct, including the nooses that Bonne allegedly put up, Mr. Brown has not put forth any evidence that Rockland's conduct—that is, the failure properly to address the harassment—was "deliberate" rather than merely "negligent" or "ineffective." *Id.* at 229–30 (alterations omitted). Once Mr. Brown notified Pfeil of the nooses, Pfeil immediately took them down, and, Mr. Brown has not proffered any evidence suggesting that Pfeil's failure to remedy the two incidents more effectively was intentional or deliberate. Accordingly, Rockland's motion for summary judgment with respect to Mr. Brown's constructive discharge claim is granted.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Rockland's motion for summary judgment.

396

The Clerk of the Court is directed to close docket entry number 8.

*It is so ordered.*